Thomas C. Mundell, #99081
E-mail: tmundell@mohlaw.net
Laura Lynch Marchione, #252553
E-mail: llynch@mohlaw.net
MUNDELL, ODLUM & HAWS, LLP
8300 Utica Avenue
Suite 200
Rancho Cucamonga, CA 91730

Telephone (909) 948-1918
Facsimile (909) 948-0225

Attorneys for Plaintiff
G. David Jang, M.D.

FILED
CLERK, U.S. DISTRICT COURT

MAY 2 5 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV10   3911   QDW   VBKx

| | |
|---|---|
| **G. DAVID JANG, M.D.**, an individual, | CASE NO. _____ |
| Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND FOR ENFORCEMENT OF EQUITABLE LIEN** |
| vs. | |
| **BOSTON SCIENTIFIC SCIMED, INC.**, a corporation; and **BOSTON SCIENTIFIC CORPORATION**, a corporation, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff G. David Jang, M.D. complains and alleges as follows:

## I

## JURISDICTION AND VENUE

1.    Plaintiff G. David Jang, M.D. (hereafter "plaintiff" or "Dr. Jang") is a medical doctor and a citizen of the State of California.

2.    Defendant Boston Scientific Scimed, Inc. (hereafter sometimes "Scimed") is a Minnesota corporation with its headquarters and principal place of business in Maple Grove, Minnesota.  Defendant Boston Scientific Corporation (hereafter sometimes "Boston

MUNDELL,
ODLUM &
HAWS, LLP

COPY

Complaint for Breach of Contract [etc.]

Scientific") is a Delaware corporation with its headquarters and principal place of business in Natick, Massachusetts.

3.     This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is an action wholly between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

4.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because this is the district where the sole plaintiff resides and the district in which plaintiff's claims arose.

## II

## FACTUAL ALLEGATIONS

5.     Dr. Jang is an interventional cardiologist, professor of medicine, and inventor. Among Dr. Jang's many inventions in the field of cardiology is a coronary stent covered by United States Patent No. 5,922,021, *Intravascular Stent* (issued July 13, 1999) (hereafter "the '021 Patent").

6.     In June 2002, Dr. Jang and defendant Scimed entered into a written assignment agreement (hereafter "the Assignment Agreement").

7.     Pursuant to the Assignment Agreement, Dr. Jang agreed to assign numerous patents, including the '021 Patent, (collectively "the Jang Stent Patents") to Scimed and Scimed agreed to pay Dr. Jang up to $160 million – $50 million at closing, plus up to an additional $110 million depending upon the occurrence of various contingencies.

8.     One such contingency had to do with the outcome of any litigation Scimed might commence against a third party for infringing any of the assigned Jang Stent Patents. The Assignment Agreement provided that Dr. Jang would  be entitled to ten percent of Scimed's recovery from the third party infringer (over and above Scimed's reasonable costs of litigation and subject to a "cap" of $60 million).  The Assignment Agreement also provided that if Scimed did not receive a CE Mark for any of the Jang Stent Patents by July 31, 2004, Scimed would pay Dr. Jang $10 million, which $10 million payment would reduce

the above-described $60 million cap to $50 million.  Scimed did not receive a CE Mark for any of the Jang Stent Patents by July 31, 2004 and paid to Dr. Jang the required $10 million later that year.

9.     The Assignment Agreement further provided that Dr. Jang would be entitled to an additional $50,000,000 if either Scimed's or a third party infringer's sales of stents covered by any of the Jang Stent Patents, during the five year period commencing upon the first U.S. sale of such a stent, equaled or exceeded $2.5 billion.

10.     On January 13, 2003, Cordis Corporation sued BSC and Scimed (collectively "the Boston Scientific Defendants") for patent infringement in  the United States District Court for the District of Delaware (Case No. CV-03-027-SLR, hereafter "the 027 Case").  On March 5, 2003, the Boston Scientific Defendants filed a counterclaim against Cordis Corporation in the 027 case, seeking recovery for infringement of  the '021 Patent.  On October 17, 2008, Cordis Corporation filed a second suit for patent infringement against the Boston Scientific Defendants in the United States District Court for the District of Delaware (Case No. CV-08-779-SLR-LPS, hereafter "the 779 Case").

11.     On July 1, 2005, the jury returned a verdict in favor of the Boston Scientific Defendants in the 027 Case, finding that the '021 Patent was valid and that Cordis had infringed claim 36 of the '021 Patent.  A true and correct copy of the jury's verdict is attached hereto as Exhibit A.  The Federal Circuit affirmed the jury's verdict on March 31, 2009.  A true and correct copy of the Federal Circuit's opinion is attached hereto as Exhibit B.  The case subsequently returned to the trial court for trial on the issue of damages.

12.     On October 5, 2009, Dr. Jang gave written notice to the Boston Scientific Defendants, and to several other persons and entities involved in the Delaware Action, that he was claiming a lien on "(1) all rights of Boston Scientific Corporation and/or Scimed Life Systems, Inc. to recover from Cordis Corporation for infringement of U.S. Patent No. 5,922,021 (Jang) in accordance with the judgment of the United States District Court ('the

MUNDELL,
ODLUM &
HAWS, LLP

Complaint for Breach of Contract [etc.]

Infringement Judgment') in that certain civil action entitled Cordis Corporation v. Boston Scientific Corporation, et al., U.S.D.C. (Del.) Case No. 03-027-SLR ('the 027 Case') and the affirming opinion of the United States Court of Appeals for the Federal Circuit dated March 31, 2009 in Case No. 2008-1003, -1072; and (2) all consideration received, or hereafter received, by Boston Scientific Corporation and/or Scimed Life Systems, Inc. from Cordis Corporation, Johnson & Johnson, Inc., or any other person or entity, in settlement of the Infringement Judgment, the affirming opinion of the Federal Circuit, or the rights of Boston Scientific Corporation and/or Scimed Life Systems, Inc. derived therefrom." Said notice, a true and correct copy of which is attached hereto as Exhibit C, together with a true and correct copy of the accompanying cover letter from Dr. Jang to the various recipients, was sent by facsmile and by Federal Express overnight delivery directly to both of the Boston Scientific Defendants and their counsel of record.

13.     On or about February 1, 2010, the Boston Scientific Defendants settled the 027 Case. By the terms of the settlement, the Boston Scientific Defendants (1) granted Cordis Corporation and Johnson & Johnson, Inc. a fully paid-up, retroactive, perpetual, and irrevocable license to, *inter alia*, eleven Jang patents, including the '021 Patent which Cordis had already been found to have infringed; (2) stipulated to entry of judgment in the 027 Case and the 779 Case in favor of Johnson & Johnson in the amount of $1,750,000,000.00; and (3) released all claims that the Boston Scientific Defendants had against Cordis and Johnson & Johnson for infringement of any of the Jang patents, including the '021 Patent.

14.     In return, the Boston Scientific Defendants received from Cordis and Johnson & Johnson (1) fully paid-up, retroactive, perpetual, and irrevocable licenses to certain stent patents ("the Gray and Palmaz Patents") owned by Cordis and Johnson & Johnson; and (2) a release of any claims that Cordis or Johnson & Johnson had against the Boston Scientific Defendants for infringement of the Gray and Palmaz Patents.

MUNDELL,
ODLUM &
HAWS,LLP

4

15. At the time of the above-described settlement, Cordis was suing the Boston Scientific Defendants in the 027 Case and the 779 Case for infringing the Gray and Palmaz Patents. Moreover, the Boston Scientific Defendants had been held liable to Cordis and the liability determination had been affirmed on appeal. Cordis' claims were about to go to trial on the issue of damages. Plaintiff is informed and believes, and on that basis alleges, that Cordis' infringement claims against the Boston Scientific Defendants were worth several billion dollars and that the release of those claims which the Boston Scientific Defendants obtained in connection with the above-described settlement was also worth several billion dollars. Plaintiff is further informed and believes, and on that basis alleges, that the fully paid-up, retroactive, perpetual, and irrevocable licenses to the Gray and Palmaz Patents which the Boston Scientific Defendants received in connection with the above-described settlement are also worth several billion dollars.

16. Plaintiff is further informed and believes, and on that basis alleges, that the Boston Scientific Defendants' claim against Cordis based on Cordis' infringement of Dr. Jang's '021 Patent was also worth several billion dollars. Plaintiff is further informed and believes, and on that basis alleges, that the fully paid-up, retroactive, perpetual, and irrevocable licenses to the eleven Jang patents which the Boston Scientific Defendants gave to Cordis and Johnson & Johnson in connection with the above-described settlement are also worth several billion dollars.

17. Based on the foregoing, plaintiff is informed and believes, and on that basis alleges, that a proper allocation of the consideration received by the Boston Scientific Defendants in connection with the above-described settlement would reflect a benefit to the Boston Scientific Defendants of at least $2,500,000,000.00 stemming from the release by the Boston Scientific Defendants of their claim against Cordis for its proven infringement of Dr. Jang's '021 Patent and a further benefit of at least $2,500,000,000.00 stemming from the licenses to the eleven Jang Patents which the Boston Scientific Defendants granted to Cordis

MUNDELL,
ODLUM &
HAWS,LLP

Complaint for Breach of Contract [etc.]

and Johnson & Johnson in connection with the above-described settlement.

18.     On February 4, 2010, Dr. Jang wrote to the Boston Scientific Defendants asking whether, in light of the benefits which the Boston Scientific Defendants received in settlement of, inter alia, their damages claim against Cordis for infringing Dr. Jang's '021 Patent, the Boston Scientific Defendants intended to make any payments to Dr. Jang under the Assignment Agreement.

19.     On February 16, 2010, the Boston Scientific Defendants responded in writing, denying that they were obligated under the Assignment Agreement to pay anything to Dr. Jang by virtue of the consideration received by the Boston Scientific Defendants in the above-described settlement.  To date, the Boston Scientific Defendants have not paid Dr. Jang anything by reason of the above-described settlement.

### III

### FIRST CLAIM FOR RELIEF

### BREACH OF CONTRACT

### (AGAINST THE BOSTON SCIENTIFIC DEFENDANTS)

20.     Plaintiff realleges and incorporates the allegations of Paragraphs 1-19 as though set forth in full herein.

21.     Dr. Jang has performed all obligations required of him pursuant to the Assignment Agreement and has satisfied all conditions precedent to the Boston Scientific Defendants' obligation of return performance.

22.     At least $2,500,000,000.00 of the consideration received by the Boston Scientific Defendants in connection with the above-described settlement constitutes the recovery of damages for infringement of the '021 Patent.  Therefore, pursuant to the terms of the Assignment Agreement, the Boston Scientific Defendants were obligated to pay Dr. Jang $50,000,000.00, consisting of Dr. Jang's ten percent share, capped at $50,000,000.00. In addition, because the infringing sales reached $2,500,000,000.00, the Boston Scientific

MUNDELL,
ODLUM &
HAWS,LLP

Complaint for Breach of Contract [etc.]

Defendants were obligated to pay Dr. Jang an additional $50,000,000.00, as described above.

23.     The Boston Scientific Defendants breached the Assignment Agreement by (1) not paying Dr. Jang the monies due him, as described above, and (2) by repudiating any obligation to do so by letter dated February 16, 2010.

24.     Dr. Jang has been damaged by the Boston Scientific Defendants' breach of contract in an amount to be proven at trial, but not less than $100,000,000.00.

## IV

### SECOND CLAIM FOR RELIEF

### BREACH OF CONTRACT

### (AGAINST THE BOSTON SCIENTIFIC DEFENDANTS)

25.     Plaintiff realleges and incorporates the allegations of Paragraphs 1-21 as though set forth in full herein.

26.     At least $2,500,000,000.00 of the consideration received by the Boston Scientific Defendants in connection with the above-described settlement constitutes consideration received for the fully paid-up, retroactive, perpetual and irrevocable licenses to eleven of Dr. Jang's Patents, including the '021 Patent to Cordis and Johnson & Johnson. Therefore, pursuant to the terms of the Assignment Agreement, the Boston Scientific Defendants were obligated to pay Dr. Jang $50,000,000.00, consisting of Dr. Jang's ten percent share of such consideration, capped at $50,000,000.00.  In addition, because the licensing consideration reached $2,500,000,000.00, the Boston Scientific Defendants were obligated to pay Dr. Jang an additional $50,000,000.00, as described above.

27.     The Boston Scientific Defendants breached the Assignment Agreement by (1) not paying Dr. Jang the monies due him, as described above, and (2) by repudiating any obligation to do so by letter dated February 16, 2010.

28.     Dr. Jang has been damaged by the Boston Scientific Defendants' breach of

MUNDELL,
ODLUM &
HAWS, LLP

Complaint for Breach of Contract [etc.]

contract in an amount to be proven at trial, but not less than $100,000,000.00.

## V

### THIRD CLAIM FOR RELIEF

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (AGAINST THE BOSTON SCIENTIFIC DEFENDANTS)

29.     Plaintiff realleges and incorporates the allegations of Paragraphs 1-19 as though set forth in full herein.

30.     There is implied in every contract a covenant of good faith and fair dealing pursuant to which each party covenants not to do anything which would deprive the other party of the benefit of its bargain.  Under the circumstances set forth above, this implied covenant required that in prosecuting and/or settling its claim against Cordis for infringing Dr. Jang's '021 Patent, the Boston Scientific Defendants act in good faith and give Dr. Jang's interests at least as much consideration as they gave their own.  The implied covenant further required that the Boston Scientific Defendants not structure any settlement or resolution of the infringement claim in a fashion that would deprive Dr. Jang of the benefits reasonably expected by him under the Assignment Agreement.

31.     If, and only if, it should be determined that due to the fashion in which the Boston Scientific Defendants structured the above-described settlement (i.e., with no money directly paid by Cordis or Johnson & Johnson and expressly allocated to damages for infringing the '021 Patent) Dr. Jang is not entitled to ten percent of the value of the consideration received by the Boston Scientific Defendants, then, and in that event only, Dr. Jang alleges that the manner in which the Boston Scientific Defendants structured the settlement violated the implied covenant of good faith and fair dealing by depriving Dr. Jang of the benefits to which he should have been entitled under the Assignment Agreement while enriching themselves at Dr. Jang's expense.

32.     Dr. Jang has been damaged by the Boston Scientific Defendants' breach of the

implied covenant of good faith and fair dealing in an amount to be proven at trial, but not less than $100,000,000.00.

## VI

### FOURTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY

### (AGAINST THE BOSTON SCIENTIFIC DEFENDANTS)

33.     Plaintiff realleges and incorporates the allegations of Paragraphs 1-19 as though set forth in full herein.

34.     Dr. Jang reposed trust and confidence in the Boston Scientific Defendants by, inter alia, assigning them his valuable patents without receiving full compensation therefor at closing, but instead agreeing that the Boston Scientific Defendants could provide more than half of such compensation to him on a delayed basis, and giving the Boston Scientific Defendants  the right to control infringement litigation in which Dr. Jang maintained a ten percent stake, leaving himself and his interests vulnerable and dependent upon the Boston Scientific Defendants' good faith and good conduct.

35.     The Boston Scientific Defendants therefore became fiduciaries of Dr. Jang, bound by fiduciary duties of care, loyalty and honesty.

36.     If, and only if, it should be determined that due to the fashion in which the Boston Scientific Defendants structured the above-described settlement (i.e., with no money directly paid by Cordis or Johnson & Johnson and expressly allocated to damages for infringing the '021 Patent) Dr. Jang is not entitled to ten percent of the value of the consideration received by the Boston Scientific Defendants, then, and in that event only, Dr. Jang alleges that the Boston Scientific Defendants violated their fiduciary duties to him in so structuring the above-described settlement.

37.     Dr. Jang has been damaged by the Boston Scientific Defendants' breach of fiduciary duty in an amount to be proven at trial, but not less than $100,000,000.00.  In

MUNDELL,
ODLUM &
HAWS,LLP

Complaint for Breach of Contract [etc.]

addition, because in doing the things described above the Boston Scientific Defendants

acted in reckless disregard of the probability of harm to Dr. Jang, they are guilty of malice,

entitling Dr. Jang to recover exemplary damages in an amount which (1) takes into account

the reprehensibility of said defendants' conduct; (2) is reasonably related to the harm

suffered by Dr. Jang; and (3) is sufficient to punish said defendants and make an example of

them, so as to deter them and others from engaging in similar conduct in the future.

## VII

### FIFTH CLAIM FOR RELIEF

### FOR ENFORCEMENT OF EQUITABLE LIEN

### (AGAINST THE BOSTON SCIENTIFIC DEFENDANTS)

38.     Plaintiff realleges and incorporates the allegations of Paragraphs 1-19 as

though set forth in full herein.

39.     By virtue of the provisions of the Assignment Agreement, Dr. Jang is entitled

to an implied or equitable lien on (1) all rights of the Boston Scientific Defendants to

recover from Cordis for infringement of the '021 Patent, including any damages awarded for

such infringement, and (2) all consideration received by the Boston Scientific Defendants

from Cordis or Johnson & Johnson, Inc., in settlement of the Boston Scientific Defendants'

claims for infringement of the '021 Patent.  Dr. Jang gave written notice of said lien to all

affected parties, as noted above, in October 2009, nearly four months before the settlement

described above was negotiated and consummated.  In addition, Dr. Jang sought leave to

intervene in the Delaware Action, in order to protect his interests.  The Boston Scientific

Defendants successfully opposed Dr. Jang's motion for leave to intervene, effectively

"shutting him out" of the case and the attendant settlement negotiations.

40.     Notwithstanding receiving written notice of lien, and notwithstanding their

awareness that Dr. Jang was seeking to intervene in the Delaware Action, the Boston

Scientific Defendants settled their disputes in the fashion described above, without

MUNDELL,
ODLUM &
HAWS, LLP

Complaint for Breach of Contract [etc.]

informing Dr. Jang, without giving Dr. Jang an opportunity to participate in the settlement, and without arranging for Dr. Jang to receive the $100,000,000.00 to which he was entitled and which was secured by his lien.

41.     Dr. Jang is entitled foreclose his lien upon the proceeds of the above-described settlement, including, inter alia, the licenses to the Palmaz and Gray Patents which Cordis and Johnson & Johnson granted to the Boston Scientific Defendants.

42.     Alternatively, the Boston Scientific Defendants are liable, jointly and severally, to Dr. Jang in the amount of $100,000,000.00, for settling around his lien.

## VIII

## PRAYER

WHEREFORE, plaintiff G. David Jang, M.D. prays for judgment in his favor and against defendants Boston Scientific Corporation and Boston Scientific Scimed, Inc.:

1.     On the First Claim for Relief, $100 million against the Boston Scientific Defendants.

2.     On the Second Claim for Relief, $100 million against the Boston Scientific Defendants.

3.     On the Third Claim for Relief, $100 million against the Boston Scientific Defendants.

4.     On the Fourth Claim for Relief, $100 million against the Boston Scientific Defendants, plus punitive damages in an amount sufficient to punish the Boston Scientific Defendants and make an example of them, but not less than $100 million.

5.     On the Fifth Claim for Relief, for foreclosure of plaintiff's lien on the licenses to the Palmaz and Gray Patents granted to the Boston Scientific Defendants by Cordis and Johnson & Johnson or, in the alternative, $100 million dollars in damages against the Boston Scientific Defendants for settling the Delaware Action without clearing Dr. Jang's lien.

6.     For costs of suit;

MUNDELL,
ODLUM &
HAWS, LLP

Complaint for Breach of Contract [etc.]

7.     For prejudgment interest as provided by law; and

8.     For such other and further relief the court deems appropriate.

DATED: May 24, 2010                    THOMAS C. MUNDELL
                                       LAURA LYNCH MARCHIONE
                                       MUNDELL, ODLUM & HAWS, LLP



                              By:  _____
                                   Thomas C. Mundell
                                   Attorneys for plaintiff G. David Jang, M.D.

_____

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff hereby asserts its Seventh Amendment right to a trial by jury and demands a trial by jury on all issues, claims, rights, and remedies triable by right to a jury.


Dated: May 24, 2010                    Thomas C. Mundell
                                       Laura Lynch Marchione
                                       Mundell, Odlum & Haws, LLP



                              By:  _____
                                   Thomas C. Mundell
                                   Attorneys for plaintiff G. David Jang, M.D.

Mundell,
Odlum &
Haws,LLP

Complaint for Breach of Contract [etc.]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and<br>BOSTON SCIENTIFIC SCIMED, INC., | C.A. No. 03-27-SLR |
| Plaintiffs, | |
| v. | |
| CORDIS CORPORATION, | |
| Defendant. | |
| BOSTON SCIENTIFIC CORPORATION and<br>BOSTON SCIENTIFIC SCIMED, INC., | |
| Plaintiffs, | |
| v. | C.A. No. 03-283-SLR |
| CORDIS CORPORATION and<br>JOHNSON AND JOHNSON, INC., | |
| Defendants. | |

<u>JURY VERDICT</u>

We, the jury, unanimously find as follows:

EXHIBIT A PAGE 13

I.   THE '536 PATENT

1.   Has Boston Scientific shown by a preponderance of the evidence that the Cypher stent infringes claim 8 of the '536 patent?

| YES<br>(A finding for Boston Scientific) | NO<br>(A finding for Cordis) |
|---|---|
| ✓ | |

2.   Has Cordis shown by clear and convincing evidence that claim 8 of the '536 patent is invalid because the prior art would have rendered the subject matter of that claim obvious to a person of ordinary skill in the art as of September 11, 1995?

| YES<br>(A finding for Cordis) | NO<br>(A finding for Boston Scientific) |
|---|---|
| | ✓ |

2

EXHIBIT A PAGE 14

## II.   THE '021 PATENT

3.   Has Boston Scientific shown by a preponderance of the evidence that the Cypher, Bx Velocity, Bx Sonic and Genesis stents literally infringe claim 36 of the '021 patent?

| YES (A finding for Boston Scientific) | NO (A finding for Cordis) |
|---|---|
|  | ✓ |

Answer the next question, number 4, only if you answered "no" to question 3 and did so only because you determined that the Cypher, Bx Velocity, Bx Sonic and Genesis stents do not literally infringe the "corners" limitation of the '021 patent.

4.   Has Boston Scientific shown by a preponderance of the evidence that the Cypher, Bx Velocity, Bx Sonic and Genesis stents infringe the "corners" limitation of claim 36 of the '021 patent under the doctrine of equivalents?

| YES (A finding for Boston Scientific) | NO (A finding for Cordis) |
|---|---|
|  |  |

3

EXHIBIT A PAGE 15

5.  Has Cordis shown by clear and convincing evidence that claim 36 of the '021 patent is invalid because the prior art would have rendered the subject matter of that claim obvious to a person of ordinary skill in the art as of the date of invention?

| YES<br>(A finding for Cordis) | NO<br>(A finding for Boston Scientific) |
|---|---|
|  | ✓ |

4

EXHIBIT A PAGE 16

Each juror should sign the verdict form to reflect that a
unanimous verdict has been reached.

Dated _July 1_____, 2005

_____
FOREPERSON

_____

_____

_____

_____

_____

_____

_____

_____

5

EXHIBIT A PAGE 17

# United States Court of Appeals for the Federal Circuit

2008-1003, -1072

CORDIS CORPORATION,

Plaintiff-Appellant,

v.

BOSTON SCIENTIFIC CORPORATION
and SCIMED LIFE SYSTEMS, INC.,

Defendants-Cross Appellants.


Gregory L. Diskant, Patterson, Belknap Webb & Tyler LLP, of New York, New York, argued for plaintiff-appellant.  With him on the brief were Eugene M. Gelernter, Thomas W. Pippert, Kathleen M. Crotty, Scott W. Parker and Scott B. Howard.  Of counsel was Michael J. Timmons.  Of counsel on the brief was Constantine L. Trela, Jr., Sidley Austin LLP, of Chicago, Illinois.

John M. Desmarais, Kirkland & Ellis LLP, of New York, New York, argued for defendants-cross appellants.  With him on the brief were Peter J. Armenio, Young J. Park and Timothy K. Gilman.

Appealed from:  United States District Court for the District of Delaware

Judge Sue L. Robinson

EXHIBIT B PAGE 18

# United States Court of Appeals for the Federal Circuit

2008-1003, -1072

CORDIS CORPORATION,

Plaintiff-Appellant,

v.

BOSTON SCIENTIFIC CORPORATION
and SCIMED LIFE SYSTEMS, INC.,

Defendants-Cross Appellants.

Appeals from the United States District Court for the District of Delaware
in case no. 03-CV-027, Judge Sue L. Robinson.

DECIDED:   March 31, 2009

Before MAYER and DYK, Circuit Judges, and HUFF, District Judge.[*]

DYK, Circuit Judge.

Cordis Corporation ("Cordis") appeals, and Boston Scientific Corporation and Scimed Life Systems, Inc. ("Boston Scientific") cross-appeal, from a final judgment of the United States District Court for the District of Delaware. The judgment was based on two separate jury verdicts of infringement: (1) infringement by Boston Scientific of claims 1 and 23 of U.S. Patent No. 4,739,762 ("the '762 patent") and claim 2 of U.S. Patent No. 5,895,406 ("the '406 patent"), and (2) infringement by Cordis of claim 36 of U.S. Patent No. 5,922,021 ("the '021 patent"). The judgment also determined that those

---

[*]     Honorable Marilyn L. Huff, District Judge, United States District Court for the Southern District of California, sitting by designation.

claims were not invalid.  Cordis Corp. v. Boston Scientific Corp., Civ. No. 03-027-SLR (D. Del. Sept. 24, 2007) (judgment).  With one minor exception, we affirm.

BACKGROUND

Cordis and Boston Scientific own patents relating to intravascular stents, which are cylindrical lattice-like scaffolds inserted into a blood vessel and then expanded, often by using a balloon catheter, in order to hold the vessel open.  Cordis owns the '762 patent and the '406 patent, and Boston Scientific owns the '021 patent.

In January 2003, Cordis filed suit against Boston Scientific, alleging that several of Boston Scientific's stents infringe various claims of the '762 patent and the '406 patent.  Boston Scientific counterclaimed, alleging that several of Cordis's stents infringe various claims of the '021 patent.  The district court denied Cordis's motion for a preliminary injunction against sales of one of Boston Scientific's stents, and we affirmed. Cordis Corp. v. Boston Scientific Corp., 99 F. App'x 928 (Fed. Cir. 2004).

We treat the Cordis claims and the Boston Scientific claims separately.  Since Cordis is the appellant, we first discuss Boston Scientific's claims against Cordis that are the subject of the Cordis appeal.

The Boston Scientific claims:  The jury returned a verdict in July 2005 that (a) Cordis's Cypher, BX Velocity, BX Sonic, and Genesis stents do not literally infringe claim 36 of the '021 patent; (b) "the Cypher, BX Velocity, BX Sonic and Genesis stents infringe the 'corners' limitation of claim 36 of the '021 patent under the doctrine of equivalents"; and (c) claim 36 of the '021 patent is not invalid for obviousness.  Cordis Corp. v. Boston Scientific Corp., Civ. No. 03-027-SLR, 2006 WL 1305227, at *1 (D. Del.

2008-1003, -1072                    2

EXHIBIT B PAGE 20

May 11, 2006) ("Memorandum Opinion").  The district court denied Cordis's motion for judgment as a matter of law or, in the alternative, a new trial.

The Cordis claims:   On summary judgment, the district court determined that claims 1 and 23 of the '762 patent were not invalid.  A separate jury returned a verdict in favor of Cordis in June 2005 that (a) Boston Scientific's Express, Taxus Express, Express Biliary, and Liberté stents literally infringe claim 23 of the '762 patent; (b) Boston Scientific induced literal infringement of claim 1 of the '762 patent with respect to these stents; (c) the Liberté stent literally infringes claim 2 of the '406 patent; and (d) claim 2 of the '406 patent is neither anticipated nor rendered obvious by the prior art. The district court denied Boston Scientific's motion for judgment as a matter of law or, in the alternative, a new trial.

After the district court entered judgment, Cordis and Boston Scientific both timely appealed.  We have jurisdiction under 28 U.S.C. §§ 1291, 1292(c)(2), and 1295(a)(1).

DISCUSSION

We review the denial of a motion for judgment as a matter of law without deference, and we review the denial of a motion for a new trial for abuse of discretion. Hewlett-Packard Co. v. Mustek Sys., Inc., 340 F.3d 1314, 1318 (Fed. Cir. 2003).  Each party raises issues that have little merit.  We dispose of those arguments summarily, reserving more extended discussion for the few issues that merit attention.

2008-1003, -1072                                    3

EXHIBIT B PAGE 21

I

We first address Cordis's appeal.

A. "Wherein" clause construction

Cordis challenges the judgment that its BX Velocity stent infringes claim 36 of the '021 patent.  Claim 36 depends from claim 24, which in turn depends from claim 23. '021 patent col.22 l.42, col.21 l.16.

The procedural posture of this issue is unclear.  The jury found that the accused Cordis stents do not literally infringe claim 36 of the '021 patent.  Instead of addressing whether Cordis's stents infringed claim 36 under the doctrine of equivalents, the jury was asked only to determine whether Cordis's stents "infringe the 'corners' limitation of claim 36 of the '021 patent under the doctrine of equivalents." J.A. at 11,238.  The jury found that the "corners" limitation was infringed under the doctrine of equivalents. Apparently the parties agreed that the BX Velocity stent infringes all limitations of claim 36 (if properly construed by the district court) except the "corners" limitation, but the parties provided no reference in the record reflecting this agreement.  However, the district court entered judgment of infringement of claim 36, and we assume that the judgment rests upon such an agreement.

Cordis first argues that the district court erred in construing the "wherein" clause of claim 23, and that under a proper construction of this clause Cordis's BX Velocity stent does not infringe claim 36.[1]  The "wherein" clause of claim 23 describes how the

_____

[1]    This argument does not apply to Cordis's Cypher, BX Sonic, and Genesis stents.

2008-1003, -1072                    4

EXHIBIT B PAGE 22

struts within one expansion column or ring of a stent are connected to the struts of another column or ring,

> <u>wherein</u> the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.

'021 patent col.21 ll.11-15 (emphasis added).  The district court construed this "wherein" clause in claim 23 to mean "the first expansion strut in the first column does not share a longitudinal axis with the second expansion strut in the second column."  <u>Cordis Corp. v. Boston Scientific Corp.</u>, Civ. No. 03-027-SLR, 2005 WL 1322966, at *2 (D. Del. June 3, 2005) ("<u>Claim Construction</u>").  The district court refused to construe the "wherein" clause in claim 23 to exclude so-called "180 degrees out of phase" stent designs.

Claim construction is an issue of law, <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), <u>aff'd</u>, 517 U.S. 370 (1996), that we review without deference, <u>Cybor Corp. v. FAS Technologies Inc.</u>, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).

Cordis urges that the district court's construction improperly failed to exclude stents whose strut pairs are arranged "180 degrees out of phase," a phrase that both parties agree is in common usage in stent design.  In such a 180-degree out-of-phase arrangement, the struts within each expansion column or ring are connected to form pairs, and the connected ends of the pairs in one ring face the connected ends of the pairs in the next ring, forming a mirror-image pattern.  Cordis argues that if claim 23 excludes such 180-degree out-of-phase designs, then Cordis's BX Velocity stent (which

2008-1003, -1072                          5

uses a 180-degree out-of-phase design) would not infringe claim 36.   Cordis illustrated the 180-degree out-of-phase design with a diagram:



The BX Velocity

Br. for Pl.-Appellant Cordis Corp. 3.

Cordis argues that the same "wherein" clause appears in both claim 1 and claim 23; that the clauses must have the same meaning; and that the prosecution history shows that the "wherein" clause excludes 180-degree out-of-phase designs.  Cordis's argument is a bit confusing.  The issue is not the meaning of the "wherein" clause. Rather, the problem stems from the fact that claim 23 and claim 1 use different numbering systems, so that, for example, the "first expansion strut of the second expansion strut pair in the second expansion column" is not the same strut in claim 23 as in claim 1.

Under the numbering system of claim 1, each strut in a column or ring is either the "first" or "second" strut of a pair, each pair in the first ring is a "first . . . pair," and each pair in the second ring is a "second . . . pair."[2]  Thus in claim 1, the "wherein"

_____

[2]    Claim 1 of the '021 patent states:

1.  A stent in a non-expanded state, comprising:
    a  first expansion strut pair  including  a  first expansion strut  positioned adjacent to a  second expansion strut  and a joining strut of the first expansion strut pair that couples the first and

EXHIBIT B PAGE 24

clause requires the first strut of every strut pair in the first ring to be offset from the first

strut of every strut pair in the second ring, which would not be possible in a 180-degree

out-of-phase design.  However, under the numbering system of claim 23, each strut in a

ring is individually numbered "first . . . second . . . third . . . fourth . . . ," each pair in the

first ring is individually numbered "first . . . second . . . third . . . fourth . . . ," and each

pair in the second ring is individually numbered "first . . . second . . . third . . . fourth

second expansion struts at a distal end of the first expansion strut pair, a plurality of the first expansion strut pair forming a first expansion column;

a second expansion strut pair including a first expansion strut positioned adjacent to a second expansion strut and a joining strut of the second expansion strut pair that couples the first and second expansion struts of the second expansion strut pair at a proximal end of the second expansion strut pair, a plurality of the second expansion strut pair forming a second expansion column;

a first connecting strut including a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section, the first connecting strut proximal section being coupled to the distal end of the first expansion strut pair in the first expansion column and the first connecting strut distal section being coupled to the proximal end of the second expansion strut pair of the second expansion column, a plurality of the first connecting strut forming a first connecting strut column that couples the first expansion column to the second expansion column, the first connecting strut intermediate section being non-parallel to the first connecting strut proximal and distal sections, wherein the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.

'021 patent col.18 ll.9-41 (emphases added).

. . . ." [3]   Thus in claim 23, the "wherein" clause requires only one specific strut (the first

---

[3]      Claim 23 of the '021 patent states:

23.  A stent in a non-expanded state, comprising:

a first expansion column formed of a plurality of first expansion
column strut pairs, a <u>first expansion strut pair</u> including a <u>first</u>
<u>expansion strut</u> adjacent to a <u>second expansion strut</u> and a first
joining strut that couples the first and second expansion struts at
a proximal end of the first expansion strut pair, <u>a second</u>
<u>expansion strut pair</u> including a <u>third expansion strut</u> adjacent to
the second expansion strut and a second joining strut that
couples the second and third expansion struts at a distal end of
the second expansion strut pair, a <u>third expansion strut pair</u>
including a <u>fourth expansion strut</u> adjacent to the third
expansion strut and a third joining strut that couples the third
and fourth expansion struts at a proximal end of the third
expansion strut pair, a <u>fourth expansion strut pair</u> including a
<u>fifth expansion strut</u> adjacent to the fourth expansion strut and a
fourth joining strut that couples the fourth and fifth expansion
struts at a distal end of the fourth expansion strut pair, a first
expansion strut pair <u>first corner</u> formed where the first joining
strut is coupled to the first expansion strut, and a first expansion
strut pair <u>second corner</u> formed where the first joining strut is
coupled to the second expansion strut, and a second expansion
strut pair <u>first corner</u> formed where the second joining strut is
coupled to the second expansion strut, and a second expansion
strut pair <u>second corner</u> formed where the second joining strut is
coupled to the third expansion strut, and a third expansion strut
pair <u>first corner</u> formed where the third joining strut is coupled to
the third expansion strut, and a third expansion strut pair <u>second</u>
<u>corner</u> formed where the third joining strut is coupled to the
fourth expansion strut, and a fourth expansion strut pair <u>first</u>
<u>corner</u> formed where the fourth joining strut is coupled to the
fourth expansion strut, and a fourth expansion strut pair <u>second</u>
<u>corner</u> formed where the fourth joining strut is coupled to the
fifth expansion strut;

a second expansion column formed of a plurality of second
expansion column strut pairs, a <u>first expansion strut pair</u>
including a <u>first expansion strut</u> adjacent to a <u>second expansion</u>
<u>strut</u> and a first joining strut that couples the first and second
expansion struts at a proximal end of the first expansion strut
pair, a <u>second expansion strut pair</u> including a <u>third expansion</u>
<u>strut</u> adjacent to the second expansion strut and a second
joining strut that couples the second and third expansion struts

at a distal end of the second expansion strut pair, a <u>third expansion strut pair</u> including a <u>fourth expansion strut</u> adjacent to the third expansion strut and a third joining strut that couples the third and fourth expansion struts at a proximal end of the third expansion strut pair, a <u>fourth expansion strut pair</u> including a <u>fifth expansion strut</u> adjacent to the fourth expansion strut and a fourth joining strut that couples the fourth and fifth expansion struts at a distal end of the fourth expansion strut pair, a first expansion strut pair <u>first corner</u> formed where the first joining strut is coupled to the first expansion strut, and a first expansion strut pair <u>second corner</u> formed where the first joining strut is coupled to the second expansion strut, and a second expansion strut pair <u>first corner</u> formed where the second joining strut is coupled to the second expansion strut, and a second expansion strut pair <u>second corner</u> formed where the second joining strut is coupled to the third expansion strut, and a third expansion strut pair <u>first corner</u> formed where the third joining strut is coupled to the third expansion strut, and a third expansion strut pair <u>second corner</u> formed where the third joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair <u>first corner</u> formed where the fourth joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair <u>second corner</u> formed where the fourth joining strut is coupled to the fifth expansion strut; and

a first connecting strut column formed of a plurality of first connecting struts, each connecting strut of the first connecting strut column including a connecting strut proximal section, a connecting strut distal section and a connecting strut intermediate section, a first connecting strut proximal section is coupled to the joining strut of the second expansion strut pair of the first expansion strut column, and a first connecting strut distal section is coupled to the joining strut of the first expansion strut pair of the second expansion strut column, and a second connecting strut proximal section is coupled to the joining strut of the fourth expansion strut pair of the first expansion strut column, and a second connecting strut distal section is coupled to the joining strut of the third expansion strut pair of the second expansion strut column, the first connecting strut intermediate section being non-parallel to the first connecting strut proximal and distal sections <u>wherein the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.</u>

'021 patent col.19 l.53 – col.21 l.15 (emphases added).

2008-1003, -1072                                9

EXHIBIT B PAGE 27

strut of the first pair in the first ring) to be offset from one other specific strut (the "first expansion strut of the second expansion strut pair" in the second ring).   Cordis numbered a figure from the '021 patent (also known as the Jang patent) to illustrate these different numbering systems:



Br. for Pl.-Appellant Cordis Corp. 40.   Because these two specific struts could be offset from each other but yet aligned with other struts to form a 180-degree out-of-phase pattern, the language of claim 23 includes 180-degree out-of-phase designs.   Indeed, the parties appear to agree that on their face claim 1 and claim 23 each use a different

2008-1003, -1072                 10

EXHIBIT B PAGE 28

numbering system to describe the relative arrangement of a stent's struts, with the result that the claim 23 "wherein" clause does not exclude 180-degree out-of-phase designs. The question is whether the prosecution history requires that, despite its plain language, the "wherein" clause of claim 23 be construed to use the same numbering system as claim 1. Cordis argues that the prosecution history reflects such a "clear and unmistakable" disclaimer. Free Motion Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1353 (Fed. Cir. 2005); see also Omega Eng'g, Inc., v. Raytek Corp., 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). We cannot agree.

The "wherein" clause was added to claims 1 and 23 during the prosecution of the '021 patent after the examiner rejected both claims as anticipated by European Patent Application No. 95307687.4, Pub. No. 0 709 067 A2 ("Pinchasik"). Pinchasik discloses a stent whose struts are arranged in a 180-degree out-of-phase design but whose struts are not numbered. During the first office action, the examiner rejected claims 1 and 23 as anticipated by Pinchasik, coloring one of Pinchasik's stent design figures and numbering parts of the figure (labeled "Figure 2") according to the numbering system of claim 1 of the '021 patent.[4] The examiner's numbering system is, however, different than claim 23's numbering system. The examiner's rejection in light of Pinchasik made no reference to 180-degree out-of-phase designs, but simply stated that claim 1, claim 23, and other claims "are rejected under 35 U.S.C. § 102(b) as being anticipated by Pinchasik" and that "[w]ith respect to [these claims] . . . refer to the modified Figure 2

---

[4]     The exhibit included at page 7994 of the Joint Appendix shows that the examiner colored in and labeled the figure from Pinchasik, but does not disclose numbering of the figure by the examiner. The parties appear not to dispute that the examiner did number the figure according to the numbering system of claim 1 of the '021 patent.

2008-1003, -1072                11

EXHIBIT B PAGE 29

attached to this office action." J.A. at 1705. After the "wherein" clause was added to claims 1 and 23, the examiner allowed both claims. Cordis argues that the examiner used only the numbering system of claim 1 when allowing both claim 1 and claim 23, and that the examiner necessarily assumed that claim 23 used the same numbering system as claim 1. However, the examiner did not say so, and we cannot simply suppose that the claims were allowed based on an assumed identity of numbering systems. We note that Cordis does not argue that Pinchasik anticipates claim 23 of the '021 patent under the district court's claim construction, which suggests that the examiner could have allowed the claim on other grounds. Cordis also argues that both the applicant and the examiner referred to stent pairs as "longitudinally offset," but these references simply repeat the "wherein" clause and say nothing about different numbering systems. Finally, on the disclaimer issue, Cordis argues that the '021 patent's provisional application described the invention as consisting of stents whose flexibility depended on connections between "split level" (and thus offset) strut pairs, but again this language in the provisional application did not discuss the system for numbering these connected strut pairs. A disclaimer must be "clear and unmistakable," and unclear prosecution history cannot be used to limit claims. Free Motion Fitness, 423 F.3d at 1352-53; see also Inverness Med. Switz. GmbH v. Warner Lambert Co., 309 F.3d 1373, 1381-82 (Fed. Cir. 2002). The plain language of claim 23 cannot be overcome by such unclear prosecution history. Although Cordis urges that no figure in the '021 patent uses a 180-degree out-of-phase design, a patent is not confined to its disclosed embodiments. See Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc).

2008-1003, -1072                    12

EXHIBIT B PAGE 30

We affirm the district court's construction of the "wherein" clause in claim 23 of the '021 patent.

### B. Corners limitation

Alternatively, Cordis argues that the judgment of infringement of claim 36 of the '021 patent by the BX Velocity stent should be set aside, because the jury erred in concluding that the "corners" limitation of claim 36 was satisfied under the doctrine of equivalents, and because the district court erred in denying judgment as a matter of law on this ground.  The "corners" limitation appears both in the language of claim 36 itself and in claim 23, on which claim 36 depends.[5]   Cordis does not dispute the district court's construction of "corners" as "a place where two surfaces meet to form an angle." Claim Construction, 2005 WL 1322966, at *1.

First, Cordis argues that the evidence did not support the jury's verdict of infringement of this limitation under the doctrine of equivalents.  A jury's determination of infringement is a question of fact that we review to consider whether it is supported by substantial evidence.  B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1423 (Fed. Cir. 1997).

---

[5]     Claim 36 of the '021 patent states:

> 36.   The stent of claim 24, wherein the first connecting strut proximal section is coupled to the <u>second corner</u> of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the <u>first corner</u> of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the <u>second corner</u> of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the <u>first corner</u> of the third expansion strut pair of the second expansion strut column.

'021 patent col.22 ll.42-52 (emphases added).

2008-1003, -1072                    13

The district court properly found that Boston Scientific presented sufficient expert testimony that Cordis's BX Velocity stent meets the "corners" limitation of claim 36 under the doctrine of equivalents under the function-way-result test of <u>Graver Tank & Manufacturing Co. v. Linde Air Products Co.</u>, 339 U.S. 605, 608 (1950), a test that is still useful under <u>Warner-Jenkinson Co. v. Hilton-Davis Chemical Co.</u>, 520 U.S. 17, 39-40 (1997), particularly for mechanical inventions.   Boston Scientific's expert Dr. Moore testified that the "corners" in claim 36 and the circular arcs or rounded corners of the BX Velocity stent both function as actual and potential reference points for joining adjacent stent rings, fulfill this function through their similar locations, and can or do result in offset connections between stent rings.   Such testimony fulfills Boston Scientific's obligation to "provide particularized testimony and linking argument . . . with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents."   <u>Tex. Instruments Inc. v. Cypress Semiconductor Corp.</u>, 90 F.3d 1558, 1567 (Fed. Cir. 1996).

Cordis next argues that the doctrine of equivalents should not be applied in this case because the jury's finding of infringement vitiated the "corners" limitation.[6]  Cordis asserts that the circular arcs of the BX Velocity stent cannot "form an angle" as required by the district court's claim construction.   Whether the doctrine of equivalents vitiated a patent claim is a question of law we review de novo.   <u>Pfizer, Inc. v. Teva Pharms. USA, Inc.</u>, 429 F.3d 1364, 1379 (Fed. Cir. 2005).

---

[6]    Cordis also argues that circular arcs were disclaimed.  We find no basis for this in the prosecution history of the '021 patent.

2008-1003, -1072                14

The district court properly found that vitiation did not bar a doctrine of equivalents analysis here.   Although we have "refused to apply the doctrine [of equivalents] . . . where the accused device contained the antithesis of the claimed structure," Planet Bingo, LLC v. GameTech International, Inc., 472 F.3d 1338, 1345 (Fed. Cir. 2006), the circular arcs of the BX Velocity are not antithetical to the "corners" limitation in claim 36 of the '021 patent.   Boston Scientific's theory that the circular arcs of the BX Velocity stent are equivalent to the "corners" in claim 36 does not vitiate the "corners" limitation, because it does not "render[ ] the pertinent limitation meaningless," Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1359 (Fed. Cir. 2005), or "effectively eliminate that element in its entirety," Warner-Jenkinson, 520 U.S. at 29.   See Primos, Inc. v. Hunter's Specialties, Inc., 451 F.3d 841, 850 (Fed. Cir. 2006).

We affirm the district court's denial of Cordis's motions for judgment as a matter of law or, in the alternative, a new trial on infringement of the '021 patent.

## C.  New claim construction arguments

Cordis argues that the district court improperly declined after trial to adopt a new construction of "expansion columns" and "connecting strut columns" in the claims of the '021 patent.   In a motion for judgment as a matter of law on infringement of the '021 patent, Cordis raised for the first time the argument that the district court should adopt the construction of these terms that Boston Scientific had advocated in a different case relating to the '021 patent.[7]   The district court declined to do so.   Cordis Corp. v. Boston

---

[7]   The claim construction Cordis urged the district court to adopt was appealed to this court and has since been vacated and remanded.   Jang v. Boston Scientific Corp., 532 F.3d 1330, 1331 (Fed. Cir. 2008).

2008-1003, -1072                    15

EXHIBIT B PAGE 33

Scientific Corp., Civ. Nos. 03-027-SLR, 03-283-SLR, 2007 WL 2775087, at *1 (D. Del. Sept. 24, 2007).

Raising this argument for the first time in a motion for judgment as a matter of law more than a year after the jury's infringement verdict was too late. "[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial." Conoco, Inc. v. Energy & Envtl. Int'l, L.C., 460 F.3d 1349, 1359 (Fed. Cir. 2006); see also Abbott Labs. v. Syntron Bioresearch, Inc. 334 F.3d 1343, 1357 (Fed. Cir. 2003). The district court properly declined to revise its claim construction in response to Cordis's argument.

### D.  Indefiniteness

Cordis asserts that the district court erred in finding that claim 23 of the '021 patent is not indefinite. Cordis argues that claim 36, and claim 23 on which it depends, are invalid unless claim 23's "wherein" clause is construed to exclude 180-degree out-of-phase designs. Indefiniteness under 35 U.S.C. § 112 ¶ 2 is an issue of claim construction and a question of law that we review de novo. Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1319 (Fed. Cir. 2008). We see no basis for Cordis's argument. Claim 23 as construed by the district court is not indefinite.

### E.  Obviousness

Cordis argues that the jury erred in finding that claim 36 of the '021 patent was not invalid for obviousness, and that the district court erred in denying Cordis's motion for judgment as a matter of law of obviousness.

The '021 patent claims priority to its provisional application. '021 patent col.1 ll.6-8. Cordis first argues that the district court should have ruled as a matter of law that the

2008-1003, -1072                        16

## EXHIBIT B PAGE 34

'021 patent was not entitled to a priority date of April 26, 1996 (when the '021 patent's provisional application was filed), and that the correct priority date is April 25, 1997 (when the '021 patent's non-provisional application was filed). Cordis asserts that the priority date is important because after April 26, 1996, and before April 25, 1997, inventors had created stents that demonstrated that claim 36 of the '021 patent was invalid as obvious under 35 U.S.C. § 103. Cordis's basis for challenging the priority date is its theory that the '021 patent's April 1996 provisional application did not provide a sufficient written description of the patent's limitations, namely the limitation of claim 36 requiring connecting struts to be attached on one end at a "second" or bottom corner of a strut pair and on the other end at a "first" or top corner.

The written description requirement of 35 U.S.C. § 112 ¶ 1 is a question of fact, and we review a jury's findings of fact relating to the written description requirement for substantial evidence. PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235, 1243 (Fed. Cir. 2002). To comply with the written description requirement, an applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention," New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co., 298 F.3d 1290, 1295 (Fed. Cir. 2002) (quoting Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) (emphasis omitted)), namely that he or she "had invented each feature that is included as a claim limitation," New Railhead, 298 F.3d at 1295. The district court cited uncontradicted testimony from Boston Scientific's expert Dr. Moore that the '021 patent's provisional application provided a sufficient written description of the limitations of claim 36. We conclude that the jury could properly find that the '021 patent was entitled to an April 1996 priority date.

EXHIBIT B PAGE 35

Cordis alternatively argues that regardless of whether the '021 patent has a priority date of April 1996 or April 1997, several earlier patents[8] were prior art rendering claim 36 obvious. Cordis asserts that it would have been obvious to one of ordinary skill in the art to combine features of these patents to create stents with the bottom-corner-to-top-corner connecting struts disclosed in claim 36 of the '021 patent.

"We review '[the] jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact . . . for substantial evidence.'" Johns Hopkins Univ. v. Datascope Corp., 543 F.3d 1342, 1345 (Fed. Cir. 2008) (quoting LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc., 275 F.3d 1347, 1353 (Fed. Cir. 2001)). The district court cited uncontradicted testimony from Boston Scientific's expert Dr. Moore that the prior art patents cited by Cordis would be unlikely to be combined to create the connectors of claim 36 of the '021 patent, and that these prior art patents taught away from the bottom-to-top connectors described in claim 36 by describing features of such connectors as potentially harmful. The district court properly concluded there was substantial evidence that these prior art patents did not render claim 36 obvious.

We affirm the district court's denial of Cordis's motion for judgment as a matter of law or, in the alternative, a new trial on invalidity of the '021 patent.

---

[8]   U.S. Patent Nos. 5,102,417; 5,449,373; 5,643,312; 5,733,303; and 6,348,065.

EXHIBIT B PAGE 36

II

We next address Boston Scientific's cross-appeal.

A. Monographs

Boston Scientific argues that the district court erred in holding that two monographs prepared by the inventor of the '762 patent are not prior art, and erred in granting Cordis's motion for summary judgment that the asserted claims of the '762 patent are not invalid "as to the asserted claims being invalidated by the Palmaz Monographs." Cordis Corp. v. Boston Scientific Corp., Civ. No. 03-027-SLR (D. Del. June 3, 2005) (summary judgment order).

If there are no facts in dispute, whether a reference is a prior art "printed publication" within the meaning of 35 U.S.C. § 102(b) is a question of law.[9] In re Klopfenstein, 380 F.3d 1345, 1347 (Fed. Cir. 2004). Because the facts of the distribution of Dr. Palmaz's monographs are not in dispute, we review de novo the issue of whether the monographs are prior art printed publications.

In 1980 the inventor of the '762 patent, Dr. Palmaz, prepared a ten-page paper describing his work on stents. This paper is the "1980 monograph." At that time he was a resident at a hospital in California. His name was not on the paper. He gave copies of the paper to approximately six of his teachers at an oral presentation of his work to these physicians and several other colleagues. Pursuant to agreements, Palmaz later gave copies of the monograph to two companies (Vascor, Inc., and Shiley, Inc.) while

---

[9]     Under 35 U.S.C. § 102, "[a] person shall be entitled to a patent unless . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

EXHIBIT B PAGE 37

attempting to commercialize his stent technology.[10]   Neither agreement required confidentiality, and the Shiley agreement specifically stated that Shiley "shall not be committed to keep secret any idea or material submitted." J.A. at 19,473. In 1983 Dr. Palmaz revised the paper; the revised paper became the "1983 monograph." In 1983 he also gave a copy of both monographs to Werner Schultz, a technician from whom Dr. Palmaz was seeking fabrication assistance.  When Dr. Palmaz joined the faculty in 1983 at the University of Texas, San Antonio, he gave a copy of the 1983 monograph to a doctor there (who then gave it to the technician setting up Dr. Palmaz's laboratory) and to the university as part of a research proposal.  Dr. Palmaz applied for the patent that became the '762 patent in 1985.

A document is publicly accessible if it "has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation." In re Wyer, 655 F.2d 221, 226 (CCPA 1981) (quoting I.C.E. Corp. v. Armco Steel Corp., 250 F. Supp. 738, 743 (S.D.N.Y.1966)).  In general, "[a]ccessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to."  Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1569 (Fed. Cir. 1988).   Many of our cases in this area have concerned publications available in libraries, and the question has been whether the publication has been sufficiently indexed to be publicly accessible.  See, e.g., In re Cronyn, 890

---

[10]    The parties here agree that there is no evidence that copies of the monographs were given to a third commercial entity, Cook Inc., before the critical date of the '021 patent.

2008-1003, -1072                    20

F.2d 1158, 1161 (Fed. Cir. 1989); In re Hall, 781 F.2d 897, 899 (Fed. Cir. 1986); In re Wyer, 655 F.2d at 226.  Other cases have involved widespread distribution so that the public could easily obtain copies of the publication.  See, e.g., Kyocera Wireless Corp. v. Int'l Trade Comm'n, 545 F.3d 1340, 1350-51 (Fed. Cir. 2008).

Here we have a somewhat different question: whether the distribution to a limited number of entities without a legal obligation of confidentiality renders the monographs printed publications under § 102(b).  We have held that where a distribution is made to a limited number of entities, a binding agreement of confidentiality may defeat a finding of public accessibility.  But we have also held that such a binding legal obligation is not essential.  Klopfenstein, 380 F.3d at 1351.  We have noted that "[w]here professional and behavioral norms entitle a party to a reasonable expectation" that information will not be copied or further distributed, "we are more reluctant to find something a 'printed publication.'" [11]  Id. at 1350-51.

We first discuss Dr. Palmaz's distribution of copies of his monographs to his university and hospital colleagues.  We have recognized the importance of "preserv[ing] the incentive for inventors to participate in academic presentations or discussions" by noting that professional norms may support expectations of confidentiality.  Id. at 1351.  The record here contains clear evidence that such academic norms gave rise to an

---

[11]      In the public use context of § 102(b), we have similarly noted that a lack of an express promise of confidentiality is not determinative of public use, but is instead "one factor to be considered in assessing all the evidence."  Bernhardt, L.L.C. v. Collezione Europa USA, Inc., 386 F.3d 1371, 1379 (Fed. Cir. 2004) (quoting Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1266 (Fed. Cir. 1986)), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); see also Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1382 (Fed. Cir. 2005).

EXHIBIT B PAGE 39

expectation that disclosures will remain confidential.[12]   Cordis's expert Dr. Buller

testified that the "code of practice which occurs worldwide in academic circles, in

departments, in medicine" includes treating a document describing scientific research in

the "same confidential manner as you would if you had been given it directly by the

author."   J.A. at 8540-41.   The district court properly concluded that Dr. Palmaz's

distribution of the monographs to his academic and research colleagues did not render

the monographs prior art printed publications.

However, Boston Scientific urges that, even if the academic and hospital

distributions did not create public accessibility, the distribution of monographs to two

commercial entities did so.   These distributions occurred during attempts to interest the

two companies in development of Dr. Palmaz's stent designs.   There is no claim here

that the two commercial entities provided any express agreement to keep the document

confidential; indeed, one entity's disclosure agreement did not discuss the entity's

confidentiality obligations, and the other entity's disclosure agreement specifically

disclaimed such obligations (most likely to avoid a lawsuit resulting from inadvertent

disclosure).   Boston Scientific argues that under the decision of our predecessor court,

the Court of Claims, in Garrett Corp. v. United States, "[w]hile distribution [of a

government report] to government agencies and personnel alone may not constitute

publication, distribution to commercial companies without restriction on use clearly

does."   422 F.2d 874, 878 (Ct. Cl. 1970) (citation omitted).

---

[12]    The only potentially contrary testimony is a statement in a report by
Boston Scientific's expert that a "colleague, faculty member or other recipient [of the
monographs] . . . would be under no obligation to maintain the disclosure in confidence."
J.A. at 19,386.  As we have discussed, whether or not recipients have a legal obligation
to maintain confidentiality is not determinative.

EXHIBIT B PAGE 40

However, the evidence here was sufficient to support a conclusion that there was an expectation of confidentiality between Dr. Palmaz and each of the two commercial entities.   While the Shiley legal agreement executed before development discussions disclaimed a confidentiality requirement, Dr. Palmaz testified that he requested confidentiality during subsequent discussions and was "surprise[d]" when he was shown the language of the Shiley agreement.   J.A. at 8517; id. at 19,354.   There is no suggestion that the request for confidentiality was not, in fact, honored.   Dr. Palmaz confirmed that the entities kept their copies of the monograph confidential, whether or not they were legally obligated to do so.   J.A. at 8502.   The district court noted that "there is no evidence that [the commercial entities] would have distributed, or in fact did distribute, the 1980 Monograph outside of the company."   Cordis Corp. v. Boston Scientific Corp., Civ. No. 03-027-SLR, 2005 WL 1331172, at *4 (D. Del. June 3, 2005). There was no showing that similar documents in the past became available to the public as a result of disclosure by these or similar commercial entities, that these or similar commercial entities typically would make the existence of such documents known and would honor requests for public access, or that these or similar commercial entities had an incentive to make the document available, etc.   The mere fact that there was no legal obligation of confidentiality—all that was shown here—is not in and of itself sufficient to show that Dr. Palmaz's expectation of confidentiality was not reasonable.[13]

_____

[13]     Boston Scientific asserted that the district court improperly did not allow it to argue that the monographs were prior art in light of the result of a different litigation involving the '762 patent.  We do not need to reach the question of whether the earlier determination that the '762 patent was "valid" precluded further litigation of the validity determination in this case.

2008-1003, -1072                    23

We affirm the district court's holding that Dr. Palmaz's 1980 and 1983 monographs were not prior art printed publications under § 102(b), and we affirm the district court's grant of Cordis's summary judgment motion that the claims of the '762 patent are not invalidated by the Palmaz monographs.

B. Anticipation

Boston Scientific argues that the jury erred in finding that claim 2 of the '406 patent is not invalid, and that the district court erred in not granting judgment as a matter of law on grounds of anticipation. Anticipation is a question of fact; we review the jury's verdict for substantial evidence. Voda v. Cordis Corp., 536 F.3d 1311, 1321 (Fed. Cir. 2008).

Boston Scientific's theory is that Cordis's '762 patent anticipates claim 2 of Cordis's '406 patent. The parties agree that the '762 patent includes all elements of claim 2 of the '406 patent, save for the functional language in claim 1 of the '406 patent (on which claim 2 of the '406 patent depends). This functional language states, "such that the links and bands define an expandable structure having axial flexibility in an unexpanded configuration." '406 patent col.5 ll.35-39 (emphases added).[14]

---

[14]    Claims 1 and 2 of the '406 patent state:

1.  A stent having first and second ends with an intermediate section therebetween, and a longitudinal axis, comprising:
    a plurality of longitudinally disposed bands, wherein each band defines a generally continuous wave having a spatial frequency along a line segment parallel to the longitudinal axis; and
    a plurality of links for maintaining the bands in a tubular structure, wherein the links are so disposed that any single circumferential path formed by the links is discontinuous;
    such that the links and bands define an expandable structure having axial flexibility in an unexpanded configuration.

EXHIBIT B PAGE 42

Boston Scientific argues that this "such that" claim language cannot operate as a claim limitation to distinguish the '406 patent over the prior art.   Contrary to Boston Scientific's argument, we have held that functional language can be a claim limitation. See Microprocessor Enhancement Corp. v. Tex. Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir. 2008).  We conclude that the jury could properly find that the "such that" claim language is a limitation of claim 1 of the '406 patent that barred a finding of anticipation.

Boston Scientific alternatively argues that even if the "such that" functional language limits claim 2 to stents "having axial flexibility," the evidence demonstrated that the '762 patent disclosed such axial flexibility.   The district court, citing both the testimony of Boston Scientific's expert Dr. Moore and the presumption of a patent's validity, held that the evidence presented was sufficient for the jury to find that the '762 patent did not anticipate claim 2 of the '406 patent.   The district court properly concluded that substantial evidence supported the jury's verdict that claim 2 of Cordis's '406 patent was not invalid.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law that claim 2 of the '406 patent is anticipated and invalid.

### C.  "Thin-walled"

Boston Scientific argues that the jury erred in finding that Boston Scientific's Express and Taxus Express stents literally infringe claim 23 of the '762 patent, and in finding that Boston Scientific induced literal infringement of claim 1 of the '762 patent

---

2.  A stent according to claim 1, wherein each link is axially displaced from any circumferentially adjacent link.

'406 patent col.5 ll.26-41 (emphases added).

2008-1003, -1072                   25

EXHIBIT B PAGE 43

with respect to these stents.[15]   Claim 23 of the '762 patent depends from claim 13.  '762

patent col.12 ll.55-60.   Boston Scientific also argues that the district court erred in

---

[15]      Claims 1, 13, and 23 of the '762 patent state:

1.   A method for implanting a prosthesis within a body passageway
     comprising the steps of:
          utilizing a <u>thin-walled</u>, tubular member as the prosthesis, the
               tubular member having a plurality of slots formed therein, the
               slots being disposed <u>substantially parallel</u> to the longitudinal
               axis of the tubular member;
          disposing the prosthesis upon a catheter;
          inserting the prosthesis and catheter within the body passageway
               by catheterization of said body passageway; and
          expanding and deforming the prosthesis at a desired location
               within the body passageway by expanding a portion of the
               catheter associated with the prosthesis to force the
               prosthesis radially outwardly into contact with the body
               passageway, the prosthesis being deformed beyond its
               elastic limit.

13.  An expandable intraluminal vascular graft, comprising:
          a <u>thin-walled</u> tubular member having first and second ends and
               a wall surface disposed between the first and second ends,
               the wall surface having a substantially uniform thickness and
               a plurality of slots formed therein, the slots being disposed
               <u>substantially parallel</u> to the longitudinal axis of the tubular
               member;
          the tubular member having a first diameter which permits
               intraluminal delivery of the tubular member into a body
               passageway having a lumen; and
          the tubular member having a second, expanded and deformed
               diameter, upon the application from the interior of the tubular
               member of a radially, outwardly extending force, which
               second diameter is variable and dependent upon the amount
               of force applied to the tubular member, whereby the tubular
               member may be expanded and deformed to expand the
               lumen of the body passageway.

2008-1003, -1072                         26

EXHIBIT B PAGE 44

denying its motion for judgment as a matter of law of noninfringement under the "thin-walled" limitation of claim 1 and claim 13.

First, Boston Scientific argues that the district court construed the term "thin-walled" improperly.  The district court construed "thin-walled" in claim 1 and claim 13 of the '762 patent as "the wall of the tubular member must have little extent from one surface to its opposite at both its first and second diameters."  Claim Construction, 2005 WL 1322966, at *2.  The district court's claim construction was proper, and the district court was not obligated, as Boston Scientific urges, to construe "thin-walled" to exclude stent walls whose struts are thicker than they are wide.

Second, Boston Scientific complains that the district court refused to allow Boston Scientific to argue the prosecution history of the '762 patent to the jury, and that the district court's exclusion of this argument prejudiced Boston Scientific's noninfringement case.  Boston Scientific had sought to use the prosecution history of the '762 patent to show that Cordis had admitted that stents whose thicknesses were within a particular numerical range were not "thin-walled."[16]  In effect, Boston Scientific sought to argue claim construction to the jury.  We have held that it is improper to argue claim construction to the jury because the "risk of confusing the jury is high when

---

23. The expandable intraluminal vascular graft of claim 13, wherein the outside of the wall surface of the tubular member is a smooth surface, when the tubular member has the first diameter.

'762 patent col.10 l.6–col.11 l.9; col.11 l.62–col.12 l.15; col.12 ll.55-60 (emphases added).

[16]    When affirming the district court's denial of Cordis's preliminary injunction motion in this case, we found no error in the district court's conclusion that the prosecution history did not limit "thin-walled" to "thicknesses no greater than 0.0045 inches."  Cordis Corp., 99 F. App'x at 933.

2008-1003, -1072                     27

experts opine on claim construction." CytoLogix Corp. v. Ventana Med. Sys., Inc., 424 F.3d 1168, 1172-73 (Fed. Cir. 2005); see Sundance, Inc. v. DeMonte Fabricating Ltd., 550 F.3d 1356, 1364 n.6 (Fed. Cir. 2008). The district court thus properly excluded Boston Scientific's claim construction argument before the jury, and properly held that its exclusion of this argument did not entitle Boston Scientific to a new trial.

Third, Boston Scientific argues that even under the district court's claim construction, Cordis did not present sufficient evidence that the Express and Taxus Express stents meet the "thin-walled" limitations of claim 1 and claim 13 (on which claim 23 depends). The district court cited testimony by Cordis's expert Dr. Buller describing how the Express and Taxus Express stents meet the "thin-walled" limitation of claims 1 and 23 under the district court's construction of this limitation. Memorandum Opinion, 2006 WL 1305227, at *12. We conclude that the district court properly found that Cordis presented substantial evidence to support the jury's infringement verdict.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law that the Express and Taxus Express stents do not infringe claims 1 and 23 of the '762 patent under the "thin-walled" limitation of these claims.

D. "Substantially parallel"

Boston Scientific argues that the jury erred in finding that Boston Scientific's Liberté stent infringes claims 1 and 23 of the '762 patent, and that the district court erred in denying Boston Scientific's motion for judgment as a matter of law of noninfringement under the "substantially parallel" limitations of claim 1 and claim 13 (on which claim 23 depends). Both claim 1 and claim 13 describe stents whose slots (spaces or openings within a stent's lattice design) are "disposed substantially parallel to the longitudinal

axis" of the stent. '762 patent col.10 l.61–col.11 l.9; col.11 l.62–col.12 l.15 (emphasis added).

Boston Scientific first contends that the district court erred by not construing the term "parallel" in claim 1 and claim 13 of the '762 patent. This argument was not timely raised before the district court and has been waived. <u>Conoco</u>, 460 F.3d at 1359.

Next, Boston Scientific argues that Cordis did not present substantial evidence that the Liberté stent meets the "substantially parallel" limitation in claims 1 and 23. Boston Scientific asserts that the Liberté stent's banana-shaped slots are not substantially parallel to the stent's longitudinal axis. The district court cited testimony of both parties' experts to support its finding that Cordis provided sufficient evidence to support the jury's infringement verdict under the "substantially parallel" limitation. <u>Memorandum Opinion</u>, 2006 WL 1305227, at *10. We conclude that substantial evidence supported the jury's verdict.

Boston Scientific further asserts that the district court's exclusion of the deposition testimony about the Liberté stent by Dr. Palmaz, the inventor of the '762 patent, warrants a new trial. Dr. Palmaz testified during a deposition that the slots of the Liberté stent "deviate from the longitudinal axis" of the stent. J.A. at 11,520. The district court excluded this testimony, finding that Dr. Palmaz was not an expert on the Liberté stent and that his testimony did not provide relevant evidence of infringement and created a risk of prejudice. <u>Memorandum Opinion</u>, 2006 WL 1305227, at *14. Boston Scientific argues that this testimony of Dr. Palmaz was important in defining the meaning of the claim term "substantially parallel" and in rebutting Cordis's evidence that the Liberté stent infringed claims 1 and 23 of the '762 patent. As noted earlier, claim

2008-1003, -1072                    29

EXHIBIT B PAGE 47

construction cannot be argued to the jury.  CytoLogix Corp., 424 F.3d at 1172-73; see also Sundance, 550 F.3d at 1364 n.6.  "[I]nventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction," and as the inventor of the '762 patent, Dr. Palmaz also had no special expertise regarding the alleged infringement of the patent by the Liberté stent.  Howmedica Osteonics Corp. v. Wright Med. Tech., Inc., 540 F.3d 1337, 1346-47 (Fed. Cir. 2008); see also Air Turbine Tech., Inc. v. Atlas Copco AB, 410 F.3d 701, 714 (Fed. Cir. 2005).  The district court's exclusion of the Liberté stent portion of Dr. Palmaz's deposition testimony was within its discretion.

    We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law or a new trial that the Liberté stent does not infringe claims 1 and 23 of the '762 patent under the "substantially parallel" limitation of these claims.

### E.  "Wave"

    Boston Scientific contends that the jury erred in finding that the Liberté stent infringes claim 2 of the '406 patent, and that the district court erred in denying Boston Scientific's motion for judgment as a matter of law of noninfringement.  Claim 2 of the '406 patent depends from claim 1.  '406 patent col.5 ll.39-41.  The parties agree that the Liberté stent infringes all limitations of claim 2, except the limitation in claim 1 (on which claim 2 depends) describing "a plurality of longitudinally disposed bands, wherein each band defines a generally continuous wave having a spatial frequency along a line segment parallel to the longitudinal axis."  '406 patent col.5 ll.29-32 (emphasis added).

    First, Boston Scientific argues that the district court improperly refused to construe the term "wave" in claim 1.  In fact, the district court did construe the claim

2008-1003, -1072                    30

language "longitudinally disposed bands, wherein each band defines a generally continuous wave having a spatial frequency along a line segment parallel to the longitudinal axis" as "the stent has multiple elongated surfaces that run parallel to the stent's long axis, each of these surfaces having the undulating appearance of a continuous wave," though it did not separately construe the term "wave."  Claim Construction, 2005 WL 1322966, at *1.

As the district court pointed out, Boston Scientific did not suggest until after the close of the trial that the district court was required to construe the term "wave" in any other respect.  Memorandum Opinion, 2006 WL 1305227, at *6.  Under Conoco, this argument thus was not timely raised before the district court and has been waived.  460 F.3d at 1359.

Alternatively, Boston Scientific argues that even under the district court's claim construction, the evidence did not sufficiently support the jury's infringement verdict.  This contention is without merit.  The district court cited testimony by Cordis's expert Dr. Buller applying the court's claim construction and describing how the Liberté stent meets the limitations of claim 2 of the '406 patent.  Memorandum Opinion, 2006 WL 1305227, at *4.  We conclude that Cordis presented substantial evidence to support the jury's infringement verdict.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law that the Liberté stent does not infringe claim 2 of the '406 patent.

F.  Dismissal without prejudice

The district court granted Boston Scientific's motion for judgment as a matter of law that its Taxus Liberté stent (not to be confused with its Liberté stent or its Taxus

EXHIBIT B PAGE 49

Express stent) did not infringe the asserted claims of Cordis's '762 and '406 patents. The district court held that it did not have jurisdiction to consider infringement claims relating to the Taxus Liberté stent because that stent had "no nexus to the United States." <u>Memorandum Opinion</u>, 2006 WL 1305227, at *24.

However, Boston Scientific argues that the district court erred in dismissing Cordis's infringement claims against the Taxus Liberté stent without prejudice, rather than with prejudice, and asserts that Cordis failed to prove that the Taxus Liberté stent infringed the asserted claims of the '762 and '406 patents. Cordis asserts that it did not present evidence at trial that the Taxus Liberté stent infringed the asserted claims of the '762 and '406 patents under 35 U.S.C. § 271(f) because it believed such evidence related only to damages rather than to infringement liability.[17]

"Congress has not clearly stated in 35 U.S.C. § 271 or in any other statute that § 271's requirement that the infringing act happen within the United States is a threshold jurisdictional requirement as opposed to an element of the claim." <u>Litecubes, LLC v. N. Light Prods., Inc.</u>, 523 F.3d 1353, 1363 (Fed. Cir. 2008), <u>cert. denied sub nom. GlowProducts.com v. Litecubes, LLC</u>, 129 S. Ct. 578 (2008). Thus, the question of whether the Taxus Liberté stent had a nexus to the United States was an element of Cordis's liability claims, rather than a jurisdictional requirement. Because "a failure to prove the allegations alleged in a complaint requires a decision on the merits, not a dismissal for lack of subject matter jurisdiction," <u>id.</u> at 1361, the district court's dismissal

---

[17] Cordis argues that the Taxus Liberté stent has the same structure as the Liberté stent. We see no error in the district court's determination that the Taxus Liberté stent and the Liberté stent are different products.

EXHIBIT B PAGE 50

of Cordis's infringement claims regarding the Taxus Liberté stent should have been with prejudice.

We reverse the district court's dismissal without prejudice of Cordis's claims that the Taxus Liberté stent infringed the asserted claims of the '762 and '406 patents, and remand with instructions to dismiss the claims with prejudice.

III

We affirm the district court's judgment in all respects save one.  We reverse the district court's dismissal without prejudice of Cordis's claims that the Taxus Liberté stent infringed the asserted claims of the '762 and '406 patents, and remand with instructions to dismiss the claims with prejudice.

AFFIRMED-IN-PART, REVERSED-IN-PART, REMANDED

COSTS

No costs.

EXHIBIT B PAGE 51

# MUNDELL, ODLUM & HAWS, LLP

## ATTORNEYS AT LAW

THOMAS C. MUNDELL
JAMES A. ODLUM
KARL N. HAWS *
————————————
BRONWYN PETERSEN
MARSHALL L. BRUBACHER
BLAINE BURCH
JIM C. MOORE
STEPHANIE K. HARLAN
LAURA LYNCH MARCHIONE

650 EAST HOSPITALITY LANE
SUITE 470
SAN BERNARDINO, CALIFORNIA 92408
TELEPHONE: (909) 890-9500
FACSIMILE: (909) 890-9580

A California Limited Liability Partnership including a Professional Corporation

WESTLAKE VILLAGE OFFICE:
2829 TOWNSGATE ROAD
SUITE 102
WESTLAKE VILLAGE, CA 91361
TELEPHONE (805) 446-2221
FACSIMILE (805) 446-2251
* A Professional Corporation

Please Reply to Westlake Village Office

October 5, 2009

**VIA FACSIMILE AND FEDERAL EXPRESS**

Scimed Life Systems, Inc.
c/o Boston Scientific Corporation
One Boston Scientific Place
Natick, MA 01760-1537
Att'n Lawrence C. Best

Boston Scientific Corporation
One Boston Scientific Place
Natick, MA 01760-1537
Att'n  Sam R. Leno

Boston Scientific Corporation
One Boston Scientific Place
Natick, MA 01760-1537
Att'n General Counsel

Steven J. Balick
Ashby & Geddes
500 Delaware Avenue
8th Floor
Wilmington, DE 19899

Josy W. Ingersoll
Young, Conaway, Stargatt &
Taylor
1000 West Street
17th Floor
Wilmington, DE 19899

Cordis Corporation
14201 NW 60th Avenue
Miami Lakes, FL 33014

Gregory L. Diskant
Patterson Belknap Webb &
Tyler LLP
1133 Avenue of the
Americas
New York, NY 10036

John M. Desmarais
Kirland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Johnson & Johnson, Inc.
1 Johnson & Johnson Plaza
New Brunswick, NJ 08933
Att'n General Counsel

Re:    <u>Cordis Corp. v. Boston Scientific Corp.,et al. [and related cross-action]</u>
       <u>Case No. 03-027-SLR</u>

Dear recipients:

Enclosed please find a notice of lien signed by Dr. Jang. I believe this instrument is self-explanatory.
If, however, you have any questions, please direct them to the undersigned.

Very truly yours,

Thomas C. Mundell

EXHIBIT C PAGE 52

## NOTICE OF LIEN

TO:      Boston Scientific Corporation, Scimed Life Systems, Inc, Cordis
         Corporation, and Johnson & Johnson, Inc.

FROM:    G. David Jang, M.D.

DATE:    October 5, 2009

---

PLEASE TAKE NOTICE THAT G. David Jang, M.D. claims a lien on (1) all rights of Boston Scientific Corporation and/or Scimed Life Systems, Inc. to recover from Cordis Corporation for infringement of U.S. Patent No. 5,922,021 (Jang) in accordance with the judgment of the United States District Court ("the Infringement Judgment") in that certain civil action entitled *Cordis Corporation v. Boston Scientific Corporation, et al.*, U.S.D.C. (Del.) Case No. 03-027-SLR ("the 027 Case") and the affirming opinion of the United States Court of Appeals for the Federal Circuit dated March 31, 2009 in Case No. 2008-1003, -1072; and (2) all consideration received, or hereafter received, by Boston Scientific Corporation and/or Scimed Life Systems, Inc. from Cordis Corporation, Johnson & Johnson, Inc., or any other person or entity, in settlement of the Infringement Judgment, the affirming opinion of the Federal Circuit, or the rights of Boston Scientific Corporation and/or Scimed Life Systems, Inc. derived therefrom.

The claimed lien arises by virtue of the provisions of that certain Assignment Agreement between G. David Jang, M.D. and Scimed Life Systems, Inc., dated June 3, 2002, a true and correct copy of which is attached hereto as Exhibit A and incorporated by this reference ("the Assignment Agreement").

The value of the claimed lien is $100,000,000.00 plus interest, pursuant to, inter alia, Sections 3.1(c), 3.1(d) and 7.3(c) of the Assignment Agreement, or such lesser amount as may be calculated pursuant thereto, depending upon, inter alia, the sales by Cordis Corporation of infringing products during the relevant period.

PLEASE TAKE FURTHER NOTICE THAT any person who settles, pays, or facilitates settlement or payment of the rights and/or consideration subject to this lien without fully satisfying the claims of the undersigned lienholder set forth herein will be personally liable to the undersigned lienholder for the full value of said claims.

This Notice of Lien is being sent or delivered by the method(s) indicated to the persons listed on the attached list of addressees this 5th day of October, 2009.

_____
G. David Jang, M.D.

EXHIBIT C PAGE 53

## ADDRESSEES

| | |
|---|---|
| Scimed Life Systems, Inc.<br>c/o Boston Scientific Corporation<br>One Boston Scientific Place<br>Natick, MA 01760-1537<br>Att'n Lawrence C. Best | BY FEDERAL EXPRESS<br>FIRST OVERNIGHT<br>DELIVERY<br>*and*<br>BY FACSIMILE TO<br>508.650.8960 |
| Boston Scientific Corporation<br>One Boston Scientific Place<br>Natick, MA 01760-1537<br>Att'n  Sam R. Leno | BY FEDERAL EXPRESS<br>FIRST OVERNIGHT<br>DELIVERY<br>*and*<br>BY FACSIMILE TO<br>508.650.8960 |
| Boston Scientific Corporation<br>One Boston Scientific Place<br>Natick, MA 01760-1537<br>Att'n General Counsel | BY FEDERAL EXPRESS<br>FIRST OVERNIGHT<br>DELIVERY<br>*and*<br>BY FACSIMILE TO<br>508.650.8960 |
| Cordis Corporation<br>14201 NW 60th Avenue<br>Miami Lakes, FL 33014 | BY FEDERAL EXPRESS<br>FIRST OVERNIGHT<br>DELIVERY<br>*and*<br>BY FACSIMILE TO<br>786.313.2080 |
| Johnson & Johnson, Inc.<br>1 Johnson & Johnson Plaza<br>New Brunswick, NJ 08933<br>Att'n General Counsel | BY FEDERAL EXPRESS<br>FIRST OVERNIGHT<br>DELIVERY<br>*and*<br>BY FACSIMILE TO<br>732.214.0332 |
| Steven J. Balick<br>Ashby & Geddes<br>500 Delaware Avenue, 8th Floor<br>Wilmington, DE 19899 | BY FEDERAL EXPRESS<br>FIRST OVERNIGHT<br>DELIVERY<br>*and*<br>BY FACSIMILE TO<br>302.654.2067 |

EXHIBIT C PAGE 54

## ADDRESSEES (CONT'D)

Josy W. Ingersoll                                      BY FEDERAL EXPRESS
Young, Conaway, Stargatt & Taylor                      FIRST OVERNIGHT
1000 West Street, 17th Floor                           DELIVERY
Wilmington, DE 19899                                   *and*
                                                       BY FACSIMILE TO
                                                       302.576.3301


Gregory L. Diskant                                     BY FEDERAL EXPRESS
Patterson Belknap Webb & Tyler LLP                     FIRST OVERNIGHT
1133 Avenue of the Americas                            DELIVERY
New York, NY 10036                                     *and*
                                                       BY FACSIMILE TO
                                                       212.336.2222


John M. Desmarais                                      BY FEDERAL EXPRESS
Kirland & Ellis LLP                                    FIRST OVERNIGHT
601 Lexington Avenue                                   DELIVERY
New York, NY 10022                                     *and*
                                                       BY FACSIMILE TO
                                                       212.446.4900

EXHIBIT C PAGE 55

## ASSIGNMENT AGREEMENT

This Assignment Agreement (*Agreement*) is entered into as of June 3, 2002 (*Effective Date*) between G. David Jang, M.D., an individual residing at 30725 Eastbern Lane, Redlands, California (*Jang*) and Scimed Life Systems, Inc., a Minnesota corporation (*Scimed*).

### Background:

Jang has designed and developed certain stent technology. Scimed desires to acquire such technology. Scimed and Jang desire to have Scimed's sole shareholder, Boston Scientific Corporation (*BSC*), enter into a part time employment arrangement with Jang to facilitate the development and commercialization of the stent technology. Scimed also desires an option to obtain exclusive rights to pacemaker delivery technology of Jang. The parties contemplate entering into an Employment Agreement in substantially the form of **Exhibit 4.2(g)** to this Agreement (the *Employment Agreement*).

This Agreement sets forth the terms under which Jang assigns to Scimed such technology in exchange for payment at assignment of certain amounts and the obligation to make certain earn out payments as well as certain compensation obligations as specified in the Employment Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises and agreements hereinafter set forth, the parties hereto agree as follows:

### Agreement

### 1. DEFINITIONS.

**1.1 Defined Terms.** Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning set forth below.

*Affiliate* means with respect to either party, any Person that, directly or indirectly, is controlled by, controls or is under common control with such party. For purposes of this Agreement, "*control*" means, with respect to any Person, the direct or indirect ownership of more than fifty percent (50%) of the voting or income interest in such Person or the possession otherwise, directly or indirectly, of the power to direct the management or policies of such Person.

*Confidential Information* means all technical and commercial information and data which either party (the *Disclosing Party*) has or may disclose to the other party (the *Receiving Party*) pursuant to this Agreement useful in, the development or commercialization of Technology (as defined below) or Improvements (as defined below), excluding any portion thereof which: (a) is known to the Receiving Party before receipt thereof under this Agreement; (b) is disclosed to the Receiving Party by a third person who is under no obligation of confidentiality to the Disclosing Party hereunder with respect to such information and who otherwise has a right to make such disclosure; (c) is or becomes generally known in the trade through no fault of the Receiving Party; (d) is independently developed by the Receiving Party, as evidenced by the Receiving Party's written records, without use of such information; or (e) is approved for release by written

BUSDOCS:994381.7

# EXHIBIT A

# EXHIBIT C PAGE 56

authorization of the original Disclosing Party.

*Contingent Payment Products* means any stent, including any stent pre-mounted on a delivery system or any stent with coatings, coverings or other features, manufactured by or for Scimed or any of its Affiliates the development, manufacture, use, or sale of which is covered by one or more Valid Claims of the Patents in the jurisdiction in which such stent is manufactured or sold or which, but for the assignment made pursuant to this Agreement, would infringe one or more Valid Claims of the Patents. For the avoidance of doubt, for stents pre-mounted on delivery systems or stents with coatings, coverings or other features, the price of the stent together with such features constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales. For example, in the case of a stent pre-mounted on a delivery system, the price of the stent and the delivery system together constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales. Similarly, in the case of a stent with a coating, the price of the stent and coating together constitutes the price of the Contingent Payment Product for purposes of calculating Net Sales. Conversely, if a stent pre-mounted on a delivery system is sold together with a distal protection device, only the price of the stent and the delivery system is included in calculating Net Sales and not the price of the distal protection device.

*Contractual Obligation* means, with respect to any Person(s); any contract, agreement, purchase order, deed, mortgage, lease, license, indenture, other instrument, policy, commitment, undertaking, arrangement or understanding, written or oral, or other document, to which or by which any such Person is a party or otherwise subject or bound or to which or by which any property or right of any such Person is subject or bound.

*Design(s)* means any information used or useful in the design, development, delivery, manufacture or testing of stents for any medical application(s) (including Pacemaker Lead Technology but excluding Pacemaker Delivery Technology (subject to the limitations described in the definition therefor)) as well as any coatings, coverings, drug delivery mechanisms and other features used or useful in relation to the use of such stents, including but not limited to those stent designs identified in Schedule 1.

*First Commercial Sale* means the first sale of any Contingent Payment Product to a third party in the United States after such Contingent Payment Product has been granted all regulatory approvals required for importation, promotion, pricing, marketing and sale of such Contingent Payment Product in the United States.

*Legal Requirement* means any federal, state, local or foreign law, statute, standard, ordinance, code, order, rule, regulation, resolution, promulgation, or any order, judgment or decree of any court, arbitrator, tribunal or governmental authority, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force and effect of law as in effect on or prior to the Effective Date.

*Lien* means (a) any encumbrance, mortgage, pledge, lien, liability, charge or other security interest of any kind (whether absolute, accrued, contingent or otherwise) upon any property or assets of any character, or upon the income or profits therefrom; or (b) any arrangement or

2

# EXHIBIT A

# EXHIBIT C PAGE 57

agreement which prohibits the creation of such encumbrances, mortgages, pledges, liens, liabilities, charges or other security interests of any kind or which restricts transfer of capital stock (other than restrictions on transfer imposed by applicable securities laws) or other property or assets, except any assets or property held under a Contractual Obligation.

*Net Sales* means the net sales of Contingent Payment Products in amounts reported on BSC's consolidated financial statements in accordance with United States generally accepted accounting principles (as specified by the American Institute of Certified Public Accountants), consistently applied, and generally defined as the aggregate invoiced gross revenue received by Scimed or any of its Affiliates from the sale of Contingent Payment Products to a non-affiliated third party less only the following *Deductions*: (i) amounts repaid or credited by reason of defects, returns, rejections, rebates, wholesale chargebacks, retroactive price reductions or allowances, (ii) sales, excise, value added, purchase, turnover, use, and other like taxes, and customs duties, paid, (iii) fees or commissions paid to "buyer-side" intermediaries, brokers or agents, (iv) shipping charges (including freight and insurance), and (v) cash, trade and quantity discounts actually allowed (and taken) to the extent customary in the trade.

With respect to products that are sold as part of a package that includes Contingent Payment Product(s) and products that are not Contingent Payment Products, Net Sales shall equal the product of (X) the gross sales of such combined products billed to customers by Scimed, its Affiliates or sublicensees, less Deductions, calculated in accordance with the procedure specified above, multiplied by (Y) a fraction the numerator of which shall be the per unit average selling price of the Contingent Payment Product sold separately, and the denominator of which shall be the per unit average selling price of package product sold in such combined form. If there is no established average selling price of the Contingent Payment Product sold separately, then Scimed's (or its Affilates') standard cost of manufacturing of the single active Contingent Payment Product and of the package product sold in such combined form, shall be used to determine (Y).

Net Sales are calculated on sales to independent third parties and shall not include revenue received by Scimed (or any of its Affiliates) from transactions with an Affiliate; provided, that Net Sales will be calculated on the sales by Affiliates to a non-Affiliate third party.

*Pacemaker Lead Field* means the use of stents that are a pre-attached component of pacemaker leads or the leads of similar devices and which are promoted, labeled, marketed and sold exclusively for the purpose of serving as the point for terminal conduction of pacemaker impulses and not for purposes of scaffolding or stenting any body lumen, whether or not such scaffolding or stenting of any body lumen is performed in conjunction with angioplasty procedures.

*Pacemaker Delivery Technology* means systems that allow a physician to place and anchor a conductive electrode to the heart muscle, which electrode is attached to an insulated wire lead that carries a small electric impulse generated by a pacemaker to the electrode, including without limitation devices having one or more of the following components: (1) a coronary sinus selecting catheter; (2) a guiding receptacle; or (3) a pacemaker lead delivery system. The

3

# EXHIBIT A

## EXHIBIT C PAGE 58

pacemaker lead delivery system in turn may include components such as: (a) a delivery (balloon) catheter; (b) a pacemaker lead wire; or (c) a detachable connecting junction. Pacemaker Delivery Technology may be used in conjunction with Pacemaker Lead Technology. Pacemaker Delivery Technology includes without limitation that certain patent application entitled "Method of Using a Stent-like Lead System in Pacemaker Devices" to be filed by Jang to the extent containing claims covering the use of stents generally as leads in pacemaker devices and not covering any particular stent design. Pacemaker Delivery Technology does not include Pacemaker Lead Technology.

*Pacemaker Lead Technology* means an implantable stent-like electrode; provided any such stent-like electrode is promoted, labeled, marketed and sold exclusively for the purpose of serving as the point for terminal conduction of pacemaker impulses and not for purposes of scaffolding or stenting any body lumen, whether or not such scaffolding or stenting of any body lumen is performed in conjunction with angioplasty procedures.

*Person* means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, limited liability partnership, unincorporated organization, government (or any agency or political subdivision thereof) or other legal entity or organization.

*Technology* means individually and collectively the intellectual property rights embodied or disclosed in (a) all inventions, patents, patent applications and rights to file patent applications owned or controlled, directly or indirectly, by Jang relating to any Designs, including but not limited to (i) the invention disclosures, patent application(s) and patents listed in Schedule 2.1(a); (ii) any patent application filed in respect of an invention disclosure described in clause (a)(i); (iii) any patent application filed as a continuation, division, or continuation-in-part of the application(s) described in clauses (a)(i)-(ii), patents issuing therefrom and reissues, reexaminations and extensions of such patents; and (iv) any foreign counterpart to the application(s) described in clauses (a)(i)-(iii) (including divisions, continuations, confirmations, additions, renewals or continuations-in-part of such patent application), patents issuing therefrom and extensions thereof; and (b) all other disclosures, discoveries, inventions, know-how, techniques, methodologies, modifications, improvements, works of authorship, designs and data (whether or not protectable under patent, copyright, trade secrecy or similar laws) that are conceived, discovered, developed, created or reduced to practice or tangible medium of expression by Jang or any of his agents, consultants or employees at any time prior to the Effective Date or at any time in the course of Jang's employment, as further described in Section 3.2, or at any time during the Inclusion Period specified in Section 7.1 (regardless of whether or not within the course of Jang's employment). Technology includes Pacemaker Lead Technology but excludes Pacemaker Delivery Technology.

*Valid Claim* means (a) a claim of any issued patent which is contained within the Patents (defined below) and which has not expired, lapsed, or been held invalid, unpatentable or unenforceable by a final decision, which is unappealed or unappealable, of a court of competent jurisdiction or of an administrative agency having authority over patents; (b) a claim in any patent application which is contained within the Patents which patent application is less than

4

# EXHIBIT A

EXHIBIT C PAGE 59

three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired; (c) a claim of any issued patent owned or controlled by Scimed that claims an invention included in Improvements (defined below); or (d) a claim in any patent application owned or controlled by Scimed that claims an invention included in Improvements and which patent application is less than three (3) years old (measured from the original filing date) and has not been the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired.

**1.2 Other Defined Terms.** Each of the following terms have the meanings ascribed to it in the section set forth opposite such term:

| | |
|---|---|
| *Agreement* | Recitals |
| *Closing* | Section 4.1 |
| *Effective Date* | Recitals |
| *Employment Agreement* | Recitals |
| *Improvements* | Section 7.1 |
| *Inclusion Period* | Section 7.1 |
| *Indemnified Party* | Section 9.3 |
| *Indemnifying Party* | Section 9.3 |
| *Intellectual Property Rights* | Section 5.6 |
| *Jang* | Recitals |
| *Jang Assets* | Section 2.1 |
| *License Agreement* | Recitals |
| *Licensed Rights* | Section 2.2 |
| *Loss(es)* | Section 9.2 |
| *Omitted Item* | Section 7.4 |
| *Option Period* | Section 2.3 |
| *Patents* | Section 2.1 |
| *Performance Period* | Section 3.1 |
| *Prosecution* | Section 7.2 |
| *Purchase Price* | Section 3.1 |
| *Schneider Agreement* | Section 2.1(c) |
| *Scimed* | Recitals |
| *Technical Information* | Section 2.1(b) |

## 2. ASSIGNMENT.

**2.1 Assignment of Technology.** Upon the terms and subject to the conditions set forth in this Agreement, Jang shall sell, assign, transfer, convey and deliver to Scimed, and Scimed shall purchase from Jang, all and every right, title and interest of Jang in and to the following (collectively, the *Jang Assets*):

(a) All of Jang's worldwide rights and interests existing on the Effective Date in and to all Designs and all Technology, and all registrations, applications for registration and licenses for

5

# EXHIBIT A

# EXHIBIT C PAGE 60

the Designs or the Technology, together with all ancillary rights thereto, including the right to sue for damages by reason of past infringement of any such rights, including: (i) the patent(s), patent application(s) and invention disclosure(s) listed in Schedule 2.1(a); (ii) any patent application(s) filed as a continuation, division, or continuation-in-part of the patent application(s) described in clause 2.1(a)(i), patents issuing therefrom and reissues, reexaminations and extensions of such patents; (iii) any patent application(s) filed in respect of the inventions that are the subject of the invention disclosures listed in Schedule 2.1(a); and (iv) any foreign counterpart to the patent(s) and patent application(s) described in clauses 2.1(a)(i)-(iii) (including divisions, continuations, confirmations, additions, renewals or continuations-in-part of such patent applications), patents issuing therefrom and extensions thereof (collectively, the *Patents*). For the avoidance of doubt, Jang has no obligation to assign to Scimed hereunder any Pacemaker Delivery Technology except as described in Section 2.3.

(b)  All of Jang's worldwide rights and interests existing on the Effective Date in and to all information relating to the Designs or the Technology or otherwise required or useful for or incident to the performance of Jang's activities related to the Designs or the Technology, together with all ancillary rights thereto (collectively, the *Technical Information*), including all notebooks and other media listed in Schedule 2.1(b) embodying (i) the Technology or the Designs; (ii) all prior versions of the Technology or the Designs; and (iii) all other data, information and know-how, that has been developed by or for Jang and is necessary or useful to design, manufacture, use or test the Design(s) and develop enhanced or new Designs.

(c)  All of Jang's claims and rights under Section 3 of the certain Assignment and License Contract dated May 8, 1998 between Jang and Schneider (Europe) GmbH (the *Schneider Agreement*).

2.2   Future License or Supply Arrangement. In the event the parties do not enter into an exclusive license agreement within the 60-day period following Scimed's notice as described in Section 2.3(b), then upon Jang's request, Scimed shall either, as determined in Scimed's sole and absolute discretion, (i) enter into a license agreement in substantially the form attached as Exhibit 4.2(f) to this Agreement (the *License Agreement*) pursuant to which Scimed will grant to Jang a non-exclusive right and license to (a) use the Jang Assets (including Improvements) solely for purposes of developing products in the Pacemaker Lead Field; and (b) make, have made, use, import, export and sell products in the Pacemaker Lead Field that embody or use the Jang Assets (including Improvements) (collectively, the *Licensed Rights*) or (ii) enter into a supply agreement on commercially reasonable terms acceptable to Scimed in its sole discretion (the *Supply Agreement*) pursuant to which Scimed (or any of its affiliates as appropriate) shall sell to Jang stent products that incorporate the Technology to be used by Jang solely for the purpose of developing products in the Pacemaker Lead Field. Notwithstanding anything to the contrary herein, in the event that the parties are not able to agree on the terms of the Supply Agreement within thirty (30) days after Scimed's election to pursue a supply arrangement, Scimed and Jang shall enter into the License Agreement on the terms set forth therein. The parties acknowledge and agree that Scimed nor any of affiliate of Scimed is obligated, nor will it or any affiliate become obligated, (x) to supply any products to Jang in the absence of a fully

6

# EXHIBIT A

## EXHIBIT C PAGE 61

executed and delivered Supply Agreement or (y) to license to Jang any technology, intellectual property or product other than the Licensed Rights pursuant to a fully executed and delivered License Agreement.

2.3 Scimed Option. (a) During the period from the Effective Date until 11:59 PM California time on the fourth anniversary of the First Commercial Sale of any Contingent Payment Product (the *Option Period*), Scimed shall have an option to acquire from Jang an exclusive license to practice the Pacemaker Delivery Technology owned or controlled (whether directly or indirectly and whether by ownership, license or otherwise) by Jang within the Pacemaker Lead Field. Accordingly, during the Option Period, Jang shall not enter into any agreement with a third party relating to commercialization (including research, development, marketing or distribution) of products that embody or use all or any portion of the Pacemaker Delivery Technology or the Pacemaker Lead Technology (including the Improvements) for any applications, unless Jang shall first offer such opportunity to Scimed and provide Scimed and its Affiliates an opportunity to obtain an exclusive license for development and commercialization within such field. For purposes of offering Scimed and its Affiliates any such opportunity, Jang shall provide Scimed with notice, including sufficient technical detail to permit Scimed to evaluate its interest in the opportunity and shall meet with Scimed within thirty (30) days following such notice to discuss the technical features of the opportunity.  Scimed shall treat all information relating to the Pacemaker Lead Field disclosed by Jang in connection with this Section 2.3 as Confidential Information of Jang.

(b) Scimed shall notify Jang within sixty (60) days following receipt of Jang's notice of Scimed's (or its Affiliates') interest (or lack of interest) in pursuing such opportunity.  If Scimed indicates that it or one of its Affiliates wishes to pursue such opportunity, then the parties shall within sixty (60) days following Scimed's notice engage in good faith negotiation of terms for a license and/or development agreement.  If the parties cannot negotiate mutually acceptable terms for an agreement within such 60-day period, and the parties are not willing to extend the period for negotiation, then Scimed's option shall expire with respect to such opportunity and Jang may negotiate with a third party concerning such research and development opportunity; provided, however, that (i) Jang shall not provide any such third party with information or materials concerning such opportunity that are superior to the information and materials provided to Scimed; and (ii) any such agreement shall contain terms that are in the aggregate no more favorable to such third party than those offered to Scimed.  If Jang wishes to offer such opportunity to a third party on terms that are in the aggregate more favorable than those offered to Scimed and/or any of its Affiliates, Jang shall first make an offer on such "improved" terms to Scimed in accordance with the procedure specified in this Section 2.3.

(c) Notwithstanding the provisions of Section 2.3(a), it is understood and agreed that Jang may contract with independent consultants to perform services with respect to Jang's efforts to develop products in the Pacemaker Lead Field; provided that Jang shall adopt and utilize written agreements with all such independent contractors and any employees Jang, directly or indirectly, retains to perform such services that include nondisclosure and invention assignment provisions that enable Jang to obtain and perfect proprietary rights in all work product undertaken on Jang's behalf in a manner consistent with the provisions of this Section 2.3. Jang shall not contract with

7

# EXHIBIT A

# EXHIBIT C PAGE 62

any consultants directly or indirectly affiliated with any Person that sells products that are competitive with the Designs or the Technology (or has publicly announced its intention to do so) prior to securing such written agreements with those consultants.

(d) Jang shall not, until after the expiration of the Option Period, directly or indirectly, sell, transfer, lease or license the Pacemaker Delivery Technology or encumber, mortgage, pledge, or place any other lien, liability, charge or other security interest of any kind (whether absolute, accrued, contingent or otherwise) upon the Pacemaker Delivery Technology, unless Jang shall have first complied with Sections 2.3(a) and (b).

3. CONSIDERATION. In consideration of the sale and transfer by Jang of the Jang Assets to Scimed and of the agreement by Jang to perform each of its other obligations hereunder, Scimed will pay to Jang, in the form of an up front payment and contingent "earn out" payments an amount determined as set forth in Section 3.1(a)–(e):

3.1 Purchase Price. The aggregate purchase price for the Assets (the *Purchase Price*) shall be not less than $50,000,000 nor more than $160,000,000, payable as follows:

(a) BSC has previously paid Jang $1,000,000 pursuant to the certain Term Sheet entered into as of March 14, 2001 by and between the BSC and Jang, and $10,000,000 pursuant to the certain Option Agreement entered into as of May 4, 2001 by and between BSC and Jang.

(b) At the Closing, Scimed shall pay to Jang by certified bank or cashier's check or wire transfer of immediately available funds, the sum of $39,651,574.00 as consideration for the assignment to Scimed of all Intellectual Property Rights existing as of the Effective Date as well as Jang's covenant to assign to Scimed all intellectual property in Improvements conceived during the Inclusion Period.

(c) During the period commencing on the Effective Date and ending on the expiration date of the last-to-expire of the Patents that have issued or are the subject of a filed patent application as of the Effective Date, Scimed shall pay to Jang on a quarterly basis in accordance with Section 3.5, as additional consideration for the purchase of the Assets, an additional purchase price amount equal to ten percent (10%) of Net Sales in respect of Contingent Payment Products. Notwithstanding any provision of this Agreement to the contrary, the maximum aggregate contingent payment due Jang under this Section 3.1(c) shall not exceed $60,000,000 (the amounts payable under this Section 3.1(c) are the *Earn Out*).

(d) In addition to the contingent payment due Jang pursuant to Section 3.1(c), Scimed shall pay to Jang as additional consideration for the purchase of the Assets, an additional purchase price amount equal to $50,000,000 if the aggregate Net Sales of Contingent Payment Products on a *worldwide* basis during the period commencing on the date of the First Commercial Sale of Contingent Payment products in the United States and ending at 11:59 PM on the fifth anniversary of the date of the First Commercial Sale of Contingent Payment Products in the United States (the *Performance Period*) equals or exceeds $2,500,000,000.

8

# EXHIBIT A

# EXHIBIT C PAGE 63

(e)  Scimed shall pay to Jang as additional consideration for the purchase of the Assets, an additional purchase price amount equal to $10,000,000 if Scimed has not received a CE mark for any Contingent Payment Product by 11:59 PM Boston time on July 31, 2004.  Any payment pursuant to this Section 3.1(e) shall be credited against the Earn Out payments due under Section 3.1(c) for purposes of applying the cap on such payments.

3.2  Employment Agreement. BSC and Jang shall enter into the Employment Agreement as of the Effective Date, pursuant to which BSC shall pay Jang, $100,000 per year for a period of three (3) years as a part-time employee working on all technical and clinical areas of vascular stents and stent design.

3.3  Stock Option Grant.  Pursuant to the Employment Agreement, BSC shall grant to Jang a stock option to purchase 100,000 shares of BSC Common Stock in accordance with the terms of the Stock Option Agreement attached as an exhibit to the Employment Agreement.

3.4  Remittance; Foreign Exchange. (a) Scimed shall make payments required under Section 3.1(b)-(e) by wire transfer of immediately available funds delivered to the U.S. bank account identified by Jang in accordance with Section 11.6. All payments shall be stated and paid in U.S. Dollars.  For purposes of payments due under Section 3.1(c)-(d), Net Sales revenue received in currencies other than U.S. Dollars shall be converted into U.S. Dollars, in accordance with BSC's ordinary business practices, when calculating the amount of Net Sales.

(b)  With respect to Net Sales of Contingent Payment Products that are covered by a patent application but not an issued patent, Scimed's payment obligations under Sections 3.1(c)-(d) shall be subject to adjustment in the following manner to account for Net Sales made during the period prior to the issuance of a patent or the rejection of a patent application that contains the claims upon which the Valid Claims determination is made at the time such Net Sales are recorded:  (i) if Scimed ceases payment under Section 3.1(c) in respect of a Contingent Payment Product based upon the expiration of the 3-year period specified in the Valid Claims definition and a patent subsequently issues that includes such claim, then Scimed shall (1) commence making contingent payments in respect of such Contingent Payment Products and (2) pay Jang in respect of sales of such Contingent Payment Product during the period between the expiration of the 3-year period and the date a patent issues that includes such claim; and (ii) if a Contingent Payment Product with Valid Claims based solely upon a patent application that is subsequently the subject of a rejection notice from which an appeal cannot be taken or in respect of which the applicable period of appeal has expired or which patent application does not issue as a patent that includes such claim, then Scimed shall be entitled to a credit as of the date of such determination equal to the amounts (if any) paid by Scimed in respect of Net Sales of such Contingent Payment Products during the period prior to the date of such determination.  If a claim that is substantially similar to a Valid Claim described in Section 3.4(b)(ii) above issues subsequent to Scimed's application of any credit against payments made to Jang as described in Section 3.4(b)(ii) above, then Scimed shall promptly pay Jang all such amounts previously credited against contingent payments otherwise due Jang pursuant to Section 3.4(b)(ii).  Any credits applied in favor of Scimed under Section 3.4(b)(ii) will be made with any corresponding reduction in the calculation

9

# EXHIBIT A

EXHIBIT C PAGE 64

of aggregate Net Sales of Contingent Payment Products for the purposes of Section 3.1(d) unless and until such credit is subsequently reversed pursuant to the immediately preceding sentence of this Section 3.4(b); provided that if Net Sales of Contingent Payment Products on a worldwide basis equals or exceeds $2,500,000,000 as of 11:59 PM California time on the final day of the Performance Period, Scimed shall pay to Jang the amount set forth in Section 3.1(d), regardless of whether Net Sales are subsequently reduced by any such credits.

3.5   **Reports.**   Scimed shall keep and maintain, during the term of this Agreement and for a period of at least three (3) years following each calendar year in which the payment obligation accrued, records sufficient to determine the Net Sales and payments due under Section 3.1(c)-(d). Within sixty (60) days following each March 31, June 30, September 30 and December 31 in which payments are due under Section 3.1(c)-(d), Scimed shall provide Jang with a report including at least: (a) the Net Sales (in U.S. Dollars) of Contingent Payment Products that Scimed (including its Affiliates) sold during the preceding quarter; (b) identification of Contingent Payment Products consisting of systems that incorporate stents and Contingent Payment Products consisting of stand-alone stent products; (c) the calculation of contingent payments thereon; and (e) the total contingent payments so computed and due Jang. Such reports shall be submitted if sales of Contingent Payment Products have been made during a period. Upon delivery of the report due for the period ending December 31 of each year, Scimed shall also report to Jang the contingent payments due Jang for the entire preceding year.

3.6   **Audits.**   Jang shall have the right, not more than once in any twelve (12) month period, to have Scimed's relevant books and records for the calendar year in which the audited payment obligations accrued and for up to three (3) calendar years following that year audited by an independent certified public accountant of Jang's choosing and reasonably acceptable to Scimed, to ascertain the accuracy of Scimed's reports under Section 3.5 in respect of Net Sales. Such audit shall be scheduled within thirty (30) days following delivery of notice by Jang requesting such audit to Scimed, and conducted during Scimed's normal business hours, in a manner that does not unreasonably interfere with Scimed's normal business activities. If any audit discloses underpayment of contingent payments under Section 3.1(c) or Section 3.1(d), Scimed shall promptly pay Jang the amount due. Jang shall be responsible for all expenses it incurs in connection with any audit; provided, that if any audit determines that the reported total contingent payments were less than ninety percent (90%) of the actual total amount due for the period in question, the actual out-of-pocket cost of such audit shall be borne by Scimed. Jang will hold in strict confidence, and will require any certified public accountant it retains to perform an audit to hold in strict confidence, all information learned in the course of any audit, except to the extent necessary for Jang to enforce his rights under this Agreement.

3.7   **Taxes.**   In the event Scimed is required to withhold taxes or charges from the amounts paid to Jang hereunder and to pay the taxes or charges for the account of Jang, Scimed shall deliver to Jang true copies of the receipts or returns covering each such payment. The parties shall cooperate to minimize, to the extent legally permissible, the aggregate tax liabilities related to this Agreement. Notwithstanding the foregoing, such cooperation shall not cause any adverse tax consequences to be incurred by either party which would not have been incurred under the terms and conditions as described in this Agreement.

10

# EXHIBIT A

# EXHIBIT C PAGE 65

## 4. THE CLOSING

**4.1 Time and Place.** The closing of the transactions which are the subject of this Agreement (the *Closing*) shall take place at 10:00 A.M., local time, on the Effective Date, at the offices of Bingham Dana LLP, 150 Federal Street, Boston, Massachusetts 02110 or at such other time and place as Jang and Scimed may agree upon.

**4.2 Jang's Obligations at Closing.** At the Closing Jang shall: (a) execute and deliver to Scimed (i) one or more assignments of patents under the Patents in the United States and registrations therefor, in substantially the form of **Exhibit 4.2(a)(i)**; and (ii) a bill of sale, in substantially the form of **Exhibit 4.2(a)(ii)**;

(b) execute and deliver to Scimed such other good and sufficient instruments of conveyance, assignment and transfer in form and substance reasonably satisfactory to Scimed's counsel as shall be effective to vest in Scimed all rights and interests in, and subject to the Liens, good and marketable title to, the Jang Assets, including, without limitation, assignments of Patents and applications for registration thereof;

(c) deliver to Scimed all documents, certificates, consents, undertakings and assignments required to be delivered to Scimed under the provisions of this Agreement;

(d) commence delivering to Scimed physical possession of adequate copies of all media embodying the Designs and the Technology;

(e) deliver to Scimed physical possession of adequate copies of all media embodying prior versions of the Designs and the Technology and related documentation that are in Jang's possession or under the direct or indirect control of Jang;

(g) execute and deliver to BSC an Employment Agreement in substantially the form of **Exhibit 4.2(g)**; and

(h) deliver to Scimed original executed copies of instruments releasing all Liens other than those arising under the Schneider Agreement (if any).

**4.3 Scimed's Obligations and Closing.** At the Closing, Scimed shall: (a) deliver to Jang a check or wire transfer in the amount of $39,651,574.00 payable to Jang;

(b) cause BSC to execute and deliver to Jang an Employment Agreement in substantially the form of **Exhibit 4.2(g)**, including a Stock Option Agreement in the form attached to **Exhibit 4.2(g)**.

## 5. REPRESENTATIONS AND WARRANTIES OF JANG. In order to induce Scimed to

11

# EXHIBIT A

# EXHIBIT C PAGE 66

purchase the Jang Assets, Jang hereby represents and warrants to Scimed and its Affiliates as follows:

5.1  **Authority.** (a) Jang has all requisite power and authority to enter into this Agreement and consummate the transactions contemplated hereby; (b) this Agreement is a valid and binding obligation of Jang enforceable against Jang in accordance with its terms; and (c) neither the execution, delivery and performance of this Agreement and the other agreements and instruments contemplated hereunder by Jang nor the consummation by Jang of the transactions contemplated hereby and thereby will violate or conflict with or constitute a default under any Contractual Obligation applicable to Jang.

5.2  **Jang Assets.** (a) Jang has and will deliver to Scimed at the Closing, good and marketable title to all of the Jang Assets.

(b)  The Jang Assets are not subject to any Lien except those arising under the Schneider Agreement.

(c)  The transfer to Scimed at the Closing of the Jang Assets will not be subject to, nor will such transfer to the best of Jang's knowledge, subject Scimed to, any liability in respect of any taxes under any Legal Requirement arising from or relating to the ownership or use of the Jang Assets on or prior to the Closing.

5.3  **Rights of Third Parties, etc.** (a) Neither the execution and delivery of this Agreement by Jang nor the consummation by Jang of any transaction contemplated hereby does or will constitute, result in or give rise to, nor to Jang's knowledge has any other event occurred nor does any other condition exist which does or will constitute, result in or give rise to the imposition of any Lien upon, or the arising of any cause of action with respect to, any Jang Asset.

(b) Other than the assignment of the Patents as required hereunder, or as set forth on Schedule 5.3, no approval, consent, waiver, authorization or other order of, and no declaration, filing, registration, qualification or recording with, any governmental authority is required to be obtained or made by or on behalf of Jang in connection with the execution, delivery or performance of this Agreement and the transactions contemplated hereby, except as will have been obtained or made and be in full force and effect at the Closing.

5.4  **Compliance.** (a) To the best of Jang's knowledge, neither the execution and delivery of this Agreement by Jang nor the consummation by Jang of any transactions contemplated hereby does or will violate or give rise to any violation or default under any Legal Requirement or Contractual Obligation of Jang. Other than as set forth on Schedule 5.4, Jang has not granted to any other Person any license, option or other rights to develop, use, sell or exploit in any manner the Designs or the Technology, whether requiring the payment of royalties or not; and Jang is not obligated to grant to any other Person any license, option or other rights to develop, use, sell or exploit in any manner the Designs or the Technology, whether requiring the payment of royalties or not.

12

# EXHIBIT A

EXHIBIT C PAGE 67

(b) There is no litigation, at law or in equity, or any proceeding before or investigation by any foreign, federal, state or municipal board or other governmental or administrative agency or any arbitrator, against Jang in connection with the Jang Assets, filed (or to the best of Jang's knowledge, threatened or any reasonable factual basis therefor). There is no litigation at law or in equity, or any proceeding before or investigation by any foreign, federal, state or municipal board or other governmental or administrative agency or any arbitrator, filed (or to the best of Jang's knowledge threatened or any reasonable factual basis therefor), which seeks rescission of, seeks to enjoin the consummation of, or which questions the validity of, this Agreement or any of the transactions contemplated hereby. No judgment, decree or order of any foreign, federal, state or municipal court, board or other governmental or administrative agency or any arbitrator has been issued against Jang or (to the best of Jang's knowledge) any Person other than Jang which could have any material adverse effect on the Jang Assets.

(c) To the best of Jang's knowledge, neither this Agreement (including the Schedules), nor any certificate, or other information furnished or to be furnished by Jang, contains or will contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained herein not misleading.

**5.5 List of Jang Assets.** The Schedules set forth complete and accurate lists of all of the Jang Assets. Specifically, Schedule 2.1(a) sets forth all Patents, and Jang has delivered to Scimed copies of the certificates of registration for all such Patents which are registered and copies of all filed patent applications, and completed invention disclosures for all inventions for which a patent application has not yet been filed, and Jang has delivered to Scimed copies of all Technology and Technical Information embodied in tangible media.

**5.6 Intellectual Property Rights.** Schedule 2.1(a) lists all patents (and all applications therefor that are pending or in the process of preparation and all invention disclosures), in the United States and in foreign jurisdictions, relating to the Designs and the Technology (collectively, *Intellectual Property Rights*), that are directly or indirectly owned or controlled in whole or in part by Jang. Except as disclosed in Schedule 2.1(a):

(a) Jang is the sole and exclusive owner of the Intellectual Property Rights, free and clear of all claims, Liens, licenses, sublicenses, charges or encumbrances and no governmental registration of any of the Intellectual Property Rights has lapsed, expired or been cancelled, abandoned, opposed or the subject of a reexamination request.

(b) There have been no claims, and, to the best knowledge of Jang, there is no basis for any claim, challenging the scope, validity or enforceability of any of the Intellectual Property Rights.

(c) There are no instances where it has been held, claimed or alleged, whether directly or indirectly, and, to the best knowledge of Jang, there is no basis upon which a claim may be made, that any activity of Jang relating to the Jang Assets infringes or may infringe upon or is in violation of any of the intellectual property rights of a third party, or that any activity of a third party infringes or may infringe upon or is in violation of any of the Intellectual Property

13

# EXHIBIT A

EXHIBIT C PAGE 68

Rights.

(d) To the best knowledge of Jang, Scimed has no obligation to compensate any Person for the development, use, sale or exploitation of the Designs or the Technology or otherwise as a condition to the assignment of the Jang Assets to Scimed.

(e) Jang has kept secret and has not disclosed any Design(s), Technology or Technical Information that is not the subject of an issued patent to any Person other than his patent attorney or Scimed except under a written confidentiality agreement imposing an appropriate duty of confidentiality on such Person. Jang has taken appropriate measures to protect the confidential and proprietary nature of the Design(s), Technology and Technical Information that is not the subject of an issued patent, including the use of written confidentiality agreements with any person receiving same. There have been no patents or copyrights applied for or registered for any part of the Designs or the Technology other than as expressly disclosed in the Schedules.

5.7 **Enhancements, New Designs.** Neither Jang nor to Jang's knowledge any employee or agent of Jang has (a) developed or assisted in the development of enhancements of the Designs or the Technology except for enhancements included in the Designs and Technology as delivered to Scimed pursuant hereto or (b) assisted in the development by any third party of any products or technology based upon the Designs or the Technology or any part thereof.

5.8 **No Broker's or Finder's Fees.** No agent, broker, Person or firm acting on behalf of Jang is, or shall be, entitled to any commission or broker's or finder's fees from Scimed, or from any Person controlling, controlled by or under common control with Scimed, in connection with any of the transactions contemplated herein.

5.9 **Disclaimer.** EXCEPT AS EXPRESSLY PROVIDED HEREIN, JANG MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR ANY IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE WITH RESPECT TO THE DESIGNS OR TECHNOLOGY AND HEREBY DISCLAIMS THE SAME. JANG MAKES NO EXPRESS OR IMPLIED WARRANTY THAT THE USE OR SALE OF PRODUCTS EMBODYING THE DESIGNS OR TECHNOLOGY WILL NOT INFRINGE PATENTS OR OTHER INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES AND HEREBY DISCLAIMS THE SAME.

6. **REPRESENTATIONS AND WARRANTIES OF SCIMED.** In order to induce Jang to enter into and perform this Agreement and to assign and transfer the Jang Assets, and in the case of the representation set forth in Section 6.2, in reliance upon the representations and warranties made by Jang herein, Scimed represents and warrants to Jang as follows:

6.1 **Corporate Matters.** (a) Scimed is duly organized and validly existing under the laws of its incorporating jurisdiction; (b) Scimed has all requisite power and authority to enter into this

14

# EXHIBIT A

# EXHIBIT C PAGE 69

Agreement, including without limitation all required board approvals; (c) Scimed is duly authorized to execute and deliver this Agreement and to perform its obligations hereunder and consummate the transactions contemplated hereby; and (d) this Agreement is a valid and binding obligation of Scimed enforceable against Scimed in accordance with its terms.

6.2  Defaults; Consents; etc.  No approval, consent, waiver, authorization or other order of, and no declaration, filing, registration, qualification or recording with, any governmental authority is required to be obtained or made by or on behalf of Scimed for the execution, delivery or performance of this Agreement by Scimed.

6.3  No Broker's or Finder's Fees.  No agent, broker, Person or firm acting on behalf of Scimed or any of its Affiliates is, or shall be, entitled to any commission or broker's or finder's fees from Jang in connection with any of the transactions contemplated herein.

### 7.  CERTAIN AGREEMENTS OF THE PARTIES.

7.1  Improvements.  (a) Jang hereby assigns, agrees to assign and transfers to (and the following shall be the exclusive property of) Scimed, the entire right, title and interest of Jang in and to all ideas, discoveries, improvements, inventions (including without limitation discoveries of new technology and improvements to existing technology), Confidential Information, know-how, innovations, writings, works of authorship, compilations and other developments or improvements, whether or not patented or patentable, copyrightable, or reduced to practice or writing, made, discovered, invented, authored, created, developed, originated or conceived by Jang, solely or jointly, during the period from the Effective Date until 11:59 PM on the third anniversary of the Effective Date (the *Inclusion Period*) and which relate, directly or indirectly, to the Designs or any Technology (collectively, *Improvements*), whether or not such Improvements arise out of any activity (i) conducted by, for or under the direction of Scimed or (ii) conducted at Scimed's facilities, during working hours or using Scimed assets.  It is understood and agreed that (A) any of the foregoing that are within the scope of the Pacemaker Delivery Technology are expressly excluded from Improvements and (B) any of the foregoing that are within the scope of Pacemaker Lead Technology are expressly included in Improvements.  In the event that any Improvements are licensed to Jang pursuant to the License Agreement, such licensed Improvements shall be subject to the option granted Scimed under Section 2.3 of this Agreement.

(b) Jang shall communicate promptly and disclose to Scimed, in such form as Scimed may reasonably request, all information, details and data pertaining to any such Improvements, and Jang shall execute and deliver to Scimed or its designee such formal transfers and assignments and such other papers and documents and shall give such testimony as may be deemed necessary or required of Jang by Scimed or its designee to develop, preserve or extend Scimed's rights relating to any Improvements and to permit Scimed or its designee to file and prosecute patent applications and, as to copyrightable material, to obtain copyright registrations thereof.

7.2  Patent Prosecution; Maintenance.  On and after the Effective Date, Scimed will be

15

# EXHIBIT A

# EXHIBIT C PAGE 70

responsible for and will, at its expense and discretion, use commercially reasonable efforts to prepare, file (including foreign filing decisions), prosecute and maintain the Patents (including patent applications) (collectively, *Prosecution*) that relate to the Technology and any Improvements. Scimed will give such Prosecution a priority which is consistent with Scimed's efforts for other technology that is at similar stages of evolution and similar applicability, undertaken using good business judgment by Scimed. Scimed may determine that it is not commercially reasonable to pursue patent coverage for particular claims, in cases where the difficulty, expense and probability of obtaining coverage cannot be justified in comparison to the profits that sales of Contingent Payment Products that are the subject of such coverage are likely to yield; provided, that Scimed shall not accord undue weight to the amounts payable to Jang under this Agreement when making such determination.    Jang shall cooperate with Scimed to respond to office actions and complete all related applications and continuations currently in process or initiated following the Effective for no additional consideration.

7.3  **Infringement.** (a) Jang shall promptly inform Scimed in writing of any infringement of Intellectual Property Rights by a third party of which he has knowledge and shall provide Scimed with any readily available information relating to such infringement.

(b)  Scimed shall have the right, but not the obligation, to institute, prosecute and control legal proceedings to prevent or restrain such infringement. Jang agrees to assist Scimed in any infringement suit as Scimed may institute to enforce Intellectual Property Rights, or in any declaratory judgment action alleging invalidity or non-infringement of any Intellectual Property Rights brought against Jang or Scimed, at the request and expense of Scimed, and Jang will cooperate and assist in all reasonable respects, including testifying and making available relevant records, papers, information, specimens and the like. Scimed shall reimburse Jang for all reasonable expenses incurred in providing such assistance.

(c)  Any recovery of damages by Scimed in a suit brought pursuant to the provisions of this Section 7.3 shall be applied first in satisfaction of any unreimbursed expenses and legal fees of Scimed relating to the suit or settlement thereof. The balance, if any, remaining after Scimed has been compensated for expenses shall be retained by Scimed; provided, that any recovery of ordinary damages based upon such infringement shall be deemed to be "Net Sales" and upon receipt of such recovery amount, Scimed shall pay Jang as additional Earn Out from such recovery amount an amount calculated in accordance with Section 3.1(c) to reimburse Jang for payments due in respect of lost sales of Contingent Payment Products. Any such recovery shall be count towards Net Sales as of the date of the infringement for purposes of Section 3.1(d). The allocation described in this Section 7.3(c) shall not apply as to special or punitive damages.

7.4  **Non-competition.** For a period of seven (7) years after the Effective Date, Jang shall not directly or indirectly, (i) own, manage, operate, control or participate in any manner in the ownership, management, operation, or control of, or be connected as an officer, employee, partner, director, principal, consultant, agent or otherwise with, or have any financial interest in, or aid or assist anyone else in the conduct of, any business, venture or activity relating to the Designs; or (ii) offer employment to, or recruit or otherwise seek to induce any employee of Scimed or any of its Affiliates to terminate his or her employment or to violate any agreement

16

# EXHIBIT A

## EXHIBIT C PAGE 71

with or duty to Scimed or any of its Affiliates, or (iii) solicit or encourage any Person who is a customer or supplier of Scimed or any of its Affiliates to terminate its relationship with Scimed or such Affiliate. The limitation set forth in this Section 7.4 shall not prevent Jang from: 1) holding ownership interests in mutual funds, venture capital funds, or any other similar passive investment vehicles where Jang has no decision making authority; 2) owning 2% or less of any company's securities where such securities are listed on a stock exchange or a national market system; 3) owning 5% or less of any private company's securities as a "passive" investor where Jang has no decision making authority; or 4) exploiting the Pacemaker Lead Technology in accordance with the provisions of Section 2.3.

7.5.   **Further Assurances.**   (a)  At any time and from time to time, each party hereto, without further consideration, shall cooperate, take such further action and execute and deliver such further instruments and documents as may be reasonably requested by any other parties in order to carry out the provisions and purposes of this Agreement including, without limitation, (i) to execute one or more further assignments covering any of the Jang Assets constituting Intellectual Property Rights in form acceptable for recordation and (ii) in the case of Jang, to complete his obligations under Section 7.1 and Section 7.2.

   (b)  Subject to the terms of this Section 7.5, the parties agree that in the event and to the extent that any Technology or Designs existing as of the Effective Date and excluded from the schedules to this Agreement describing Technology or Designs (each, an *Omitted Item*), then Jang shall provide Scimed with a description of such Omitted Item(s) promptly upon determining that they are within the scope of Technology or Designs and Jang shall be deemed to have assigned all his right title and interest in such Omitted Item(s) as of the Effective Date without any additional consideration and the provisions of Sections 7.1-7.4, 9 and 10 shall apply to such Omitted Items. Jang shall execute and deliver such documents as Scimed may reasonably require in order to perfect or record the assignment of such Omitted Items to Scimed in accordance with the provisions of this Agreement.

   (c)  Jang acknowledges and agrees that, because the legal remedies of Scimed may be inadequate in the event of Jang's breach of, or other failure to perform, any of the covenants and obligations set forth in Section 2.3, Section 7.1, Section 7.2, Section 7.3 or Section 7.4, Scimed may, in addition to obtaining any other remedy or relief available to it (including without limitation consequential and other damages at law), seek to enforce the provisions of Section 2.3, Section 7.1, Section 7.2, Section 7.3 or this Section 7.4 by injunction and other equitable remedies without the requirement of posting bond.

8.   RISK ALLOCATION

17

# EXHIBIT A

## EXHIBIT C PAGE 72

8.1   Limitation of Liability.   EXCEPT FOR BREACH OF OBLIGATIONS UNDER SECTIONS 7.1-7.3 OR SECTION 9.1 AND EXCEPT AS OTHERWISE PROVIDED IN SECTION 8.2, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR LOST PROFITS OR FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, HOWEVER CAUSED, UNDER ANY THEORY OF LIABILITY.

8.2   Indemnification. (a)   Subject to the provisions of Section 8.3, Jang hereby indemnifies Scimed and its Affiliates against and agrees to hold each of them harmless from any and all damage, loss, liability and expense (including, without limitation, reasonable attorneys' fees and expenses in connection with any action, suit or proceeding) (collectively, *Losses*) incurred or suffered by Scimed or any of its Affiliates arising out of: (i) any misrepresentation or breach of warranty, covenant or agreement made or to be performed by Jang pursuant to this Agreement (whether or not discovered by Scimed prior to Closing); or (ii) Jang's ownership or use of the Jang Assets prior to the Closing; or (iii) Jang's ownership or use of the Pacemaker Lead Technology (including the ownership or use of the Pacemaker Lead Technology by any Affiliate or sublicensee of Jang). The foregoing indemnification action shall not apply in the event and to the extent such Losses arose as a result of any Scimed Indemnified Party's negligence, intentional misconduct or breach of this Agreement.

(b)   Subject to the provisions of Section 8.3, Scimed hereby indemnifies Jang against and agrees to Jang harmless from any and all Loss incurred or suffered by Jang arising out of: (i) any misrepresentation or breach of warranty, covenant or agreement made or to be performed by the Scimed pursuant to this Agreement; or (ii) Scimed's ownership or use of the Jang Assets following the Closing, including without limitation any product liability claim (such as any claim relating to medical malpractice by customers of Contingent Payment Products other than Jang, breach of express or implied warranty, negligence or strict liability) and any claim of infringement of intellectual property rights. The foregoing indemnification action shall not apply in the event and to the extent that such Losses arose as a result of Jang's negligence, intentional misconduct or breach of this Agreement. It is understood that Scimed's indemnification obligation shall not apply to Losses resulting from Jang's (including any Affiliate's or sublicensee's) activities with respect to the Pacemaker Lead Technology or with respect to the License Agreement, if applicable.

8.3   Procedures. To receive the benefit of indemnification under Section 8.2, the party seeking indemnification (the *Indemnified Party*) must promptly notify the party against whom indemnity is sought (the *Indemnifying Party*) in writing of any claim, or the commencement of any suit, action or proceeding in respect of which indemnity may be sought under Section 8.2 and provide reasonable cooperation (at the Indemnifying Party's expense) and tender to the Indemnifying Party (and its insurer) full authority to defend or settle the claim or suit. Neither party has any obligation to indemnify the other party in connection with any settlement made without the Indemnifying Party's written consent. The Indemnified Party has the right to participate at its own expense in the claim or suit and in selecting counsel therefor. The Indemnified Party shall cooperate with Indemnifying Party (and its insurer), as reasonably requested, at Indemnifying

18

# EXHIBIT A

# EXHIBIT C PAGE 73

Party's sole cost and expense.

**8.4   Set-Off.** Jang hereby acknowledges and agrees that Scimed shall have the right at any time to set off, against any amount owed by Scimed to Jang under Section 3.1, any and all Losses (including Losses incurred pursuant to Section 7.2 of the License Agreement, if applicable, but excluding Losses for which Jang has paid or reimbursed Scimed), whether or not such inaccuracy, breach, nonfulfillment, misrepresentation or omission was or should have been known by Scimed on the Effective Date, it being agreed that the intention of the parties is that Jang shall be completely responsible for, and Scimed shall be conclusively deemed to have relied upon such representations warranties, agreements and instruments. Any party to which Jang assigns the right to receive payment under this Agreement shall also be subject to this Section 8.4.

## 9.   MISCELLANEOUS

**9.1   Protection of Confidential Information.**   (a)   For a period ending on the later of (i) three (3) years from the date of the expiration or termination of Jang's employment with BSC, or (ii) the expiration of the Inclusion Period, Jang and Scimed (each, as a Receiving Party) shall limit access to Confidential Information received from the other party (each, a Disclosing Party) pursuant to this Agreement, to those of their employees, consultants and agents who need to have access to such information or material and who are obligated to maintain confidentiality sufficient to protect the other party's rights in its Confidential Information, and shall not use or permit to be used such Confidential Information by or for the benefit of itself (except as anticipated by this Agreement) or any independent third party.

(b)   Each party shall exercise at least the same reasonable care it uses to protect its own valuable, proprietary Confidential Information in order to prevent the disclosure of the other party's Confidential Information to independent third parties. Each party shall promptly notify the other party of any actual or suspected unauthorized use or disclosure of the other party's Confidential Information of which it has knowledge and will cooperate in the investigation of and appropriate actions with respect to such unauthorized use or disclosure. Each party shall include the other party's reasonable proprietary rights notices on any media embodying the other party's Confidential Information, including partial copies thereof, which are circulated within that party.

**9.2   Publicity.**   Scimed and its Affiliates on the one hand and Jang on the other shall consult with each other before issuing any press release or otherwise making any public statements with respect to this Agreement and the transactions contemplated hereby and shall not issue any such press release or make any such public statement except as they may mutually agree, except as is necessary for governmental notification purposes or to comply with applicable laws and regulations.

**9.3   Independent Contractors.**   Each party represents that it is acting on its own behalf as an independent contractor and is not acting as an agent for or on behalf of any third party. This Agreement and the relations hereby established by and between Jang and Scimed do not constitute a partnership, joint venture, franchise, agency or contract of employment. Scimed is

19

# EXHIBIT A

EXHIBIT C PAGE 74

not granted, and shall not exercise, the right or authority to assume or create any obligation or responsibility on behalf of or in the name of Jang or its Affiliates.

9.4  Assignment. Except in the case of assignment by Scimed to an Affiliate or pursuant to a merger, consolidation or sale of substantially all of the assets or stock of Scimed, neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld in the case of any assignment; *provided* that the proposed assignee under this Section 9.4 agrees in writing to assume all of the obligations of the assignor party under this Agreement.  Notwithstanding the foregoing, Jang may assign without consent, in whole or in part, any of the rights he has to receive monetary payments under the terms of this Agreement to one or more of the following: (1) any revocable trust of which Jang is the sole trustee and the sole settlor; (2) any irrevocable trust established by Jang as the sole settlor for members of his family, whether or not Jang is the trustee of such trust; or (3) any charitable trust of which Jang is both the sole trustee and the sole settlor. Where Jang is the trustee of a trust to which an interest is assigned pursuant to this Section 9.4 and Jang later ceases to serve as trustee as a result of his death or incapacity, any such subsequent event shall not void or vitiate the assignment(s) made to the trust. No assignment otherwise permitted under this Section 9.4 shall be valid unless and until the trustee of such trust acknowledges in writing. in form satisfactory to Scimed that the trustee, together with the trust, accept such assignment subject to all of the terms, conditions and provisions of this Agreement, including the right of set-off set forth in Section 9.4. It is understood that Scimed may from time to time perform some or all of its obligations hereunder through one or more of its Affiliates; provided that Scimed shall remain responsible for the performance of such obligations.

9.5  Successors and Assigns. This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

9.6  Notices. Unless otherwise provided herein, any notice, report, payment or document to be given by one party to the other shall be in writing and shall be deemed given when delivered personally or mailed by certified or registered mail, postage prepaid (such mailed notice to be effective on the date which is three (3) business days after the date of mailing), or sent by nationally recognized overnight courier (such notice sent by courier to be effective one business day after it is deposited with such courier), or sent by telefax (such notice sent by telefax to be effective when sent, if confirmed by certified or registered mail or overnight courier as aforesaid) as follows:

If to Jang, addressed to:
   G. David Jang, M.D.
   30725 Eastbern Lane
   Redlands, CA 92374
   Phone: 909.794.1803
   Fax: 909.794.1938

If to Scimed, addressed to:
   Boston Scientific Corporation

20

# EXHIBIT A

## EXHIBIT C PAGE 75

One Boston Scientific Place
Natick, MA 01760-1537
Attention: Lawrence C. Best
Phone: 508.650.8567
Fax: 508.650.8960

With a copy to:
Boston Scientific Corporation
One Boston Scientific Place
Natick, MA 01760-1537
Attention: General Counsel
Phone: 508.650.8567
Fax: 508.650.8960.

or to such other place as either party may designate as to itself by written notice to the other party.

9.7   Governing Law. This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts, United States of America, to the exclusion of both its rules on conflicts of laws and the provisions of the United Nations Convention on Contracts for the International Sale of Goods.

9.8   Amendment and Waiver. No provision of or right under this Agreement shall be deemed to have been waived by any act or acquiescence on the part of either party, its agents or employees, but only by an instrument in writing signed by an authorized officer of each party. Scimed and Jang may, by written notice to the other party, (a) extend the time for the performance of any of the obligations or other actions of the others under this Agreement; (b) waive any inaccuracies in the representations or warranties of the other party contained in this Agreement or in any document delivered pursuant to this Agreement; (c) waive compliance with any of the conditions to their obligations contained in this Agreement; or (d) waive or modify performance of any of the obligations of the other party under this Agreement.   Except as provided in the preceding sentence, no action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of Scimed or Jang, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained in this Agreement. The waiver by Scimed or Jang of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

9.9   Severability. In the event any provision of this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term or provision hereof.  The parties agree that they will negotiate in good faith or will permit a court or arbitrator to replace any provision hereof so held invalid, illegal or unenforceable with a valid provision which is as similar as possible in substance to the invalid,

21

# EXHIBIT A

# EXHIBIT C PAGE 76

illegal or unenforceable provision.

**9.10 Entire Agreement.** The terms and provisions contained in this Agreement (including the schedules and exhibits) and the Employment Agreement constitute the entire understanding of the parties with respect to the transactions and matters contemplated hereby and supersede all previous communications, representations, agreements and understandings relating to the subject matter hereof.   Except for the Employment Agreement, no representations, inducements, promises or agreements, whether oral or otherwise, between the parties not contained in this Agreement, the License Agreement or the Employment Agreement or incorporated by reference in this Agreement or the Employment Agreement shall be of any force or effect.  No agreement or understanding extending this Agreement or varying its terms (including any inconsistent terms in any purchase order, acknowledgment or similar form) shall be binding upon either party unless it is in a writing specifically referring to this Agreement and signed by the duly authorized representative of the applicable party.

**9.11   Captions.** Captions of the sections and subsections of this Agreement are for reference purposes only and do not constitute terms or conditions of this Agreement and shall not limit or affect the meaning or construction of the terms and conditions hereof.

**9.12  Word Meanings.** Words such as *herein*, *hereinafter*, *hereof* and *hereunder* refer to this Agreement as a whole and not merely to a section or paragraph in which such words appear, unless the context otherwise requires.  The singular shall include the plural, and each masculine, feminine and neuter reference shall include and refer also to the others, unless the context otherwise requires.

**9.13   Rules of Construction.** The parties agree that they have participated equally in the formation of this Agreement and that the language and terms of this Agreement shall not be construed against either party by reason of the extent to which such party or its professional advisors participated in the preparation of this Agreement.

**9.14  Counterparts.** This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart.

[rest of this page intentionally left blank]

22

# EXHIBIT A

# EXHIBIT C PAGE 77

IN WITNESS WHEREOF, Scimed and Jang have duly executed this Assignment Agreement as of the Effective Date, intending it to take effect as an instrument under seal.

SCIMED LIFE SYSTEMS, INC.

By: _____

Name:  Lawrence C. Best                              Name: G. David Jang, M.D.
Title:   Chief Financial Officer

Exhibit 4.2(a)(i):   Assignment of Patents
Exhibit 4.2(a)(ii):   Bill of Sale
Exhibit 4.2(f):  License Agreement
Exhibit 4.2(g):  Employment Agreement

# EXHIBIT A

EXHIBIT C PAGE 78

IN WITNESS WHEREOF, Scimed and Jang have duly executed this Assignment Agreement as of the Effective Date, intending it to take effect as an instrument under seal.

SCIMED LIFE SYSTEMS, INC.

By: _____
Name:  Lawrence C. Best
Title:   Chief Financial Officer

Name: G. David Jang, M.D.

Exhibit 4.2(a)(i):   Assignment of Patents
Exhibit 4.2(a)(ii):   Bill of Sale
Exhibit 4.2(f): License Agreement
Exhibit 4.2(g): Employment Agreement

# EXHIBIT A

# EXHIBIT C PAGE 79

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Otis D. Wright II and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

## CV10- 3911 ODW (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Thomas C. Mundell, #99081/tmundell@mohlaw.net
MUNDELL, ODLUM & HAWS, LLP
8300 Utica Avenue, Suite 200
Rancho Cucamonga, CA 91730
Telephone: 909-948-1918/Facsimile: 909-948-0225

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| G. DAVID JANG, M.D.<br><br>PLAINTIFF(S)<br>v.<br>BOSTON SCIENTIFIC SCIMED, INC., a corporation; and BOSTON SCIENTIFIC CORPORATION, a corporation<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV10  3911**  **ODW** **VBKx**<br><br>**SUMMONS** |

TO:   DEFENDANT(S): BOSTON SCIENTIFIC SCIMED, INC., a corporation; and BOSTON
SCIENTIFIC CORPORATION, a corporation

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, __Thomas C. Mundell_____, whose address is 8300 Utica Avenue, Suite 200, Rancho Cucamonga, CA 91730_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.   You also must file your answer or motion with the court.


Clerk, U.S. District Court

**CHRISTOPHER POWERS**

Dated: May 25, 2010_____          By: _____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

ORIGINAL

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| G. DAVID JANG, M.D. | BOSTON SCIENTIFIC SCIMED, INC., a corporation; and BOSTON SCIENTIFIC CORPORATION, a corporation |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Thomas C. Mundell, #99081<br>Mundell, Odlum & Haws, LLP<br>8300 Utica Avenue, Suite 200, Rancho Cucamonga, CA 91730 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☒ No      ☒ MONEY DEMANDED IN COMPLAINT: $ 100,000,000.00

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Diversity Case  brought pursuant to 28 USC 1332(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Act
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Info. Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☒ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Fed. Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury-Med Malpractice
- ☐ 365 Personal Injury-Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus-Alien Detainee
- ☐ 465 Other Immigration Actions

**TORTS**
**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 445 American with Disabilities - Employment
- ☐ 446 American with Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus/ Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE / PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety /Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS-Third Party 26 USC 7609


CV10 3911

**FOR OFFICE USE ONLY:**   Case Number: _____

### AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
                               ☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
                               ☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
                               ☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
      ☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino County | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
      ☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Boston Scientific Scimed, Inc. -- Minnesota<br>Boston Scientific Corporation -- Massachusetts |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
      **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| San Bernardino County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date May 25, 2010

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |